DAVID E. HART and BARBARA A. HART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hart v. Commissioner
Docket No. 457-80.
United States Tax Court
T.C. Memo 1983-364; 1983 Tax Ct. Memo LEXIS 431; 46 T.C.M. (CCH) 530; T.C.M. (RIA) 83364; June 20, 1983. *431 T, an executive and stockholder of foreign corporation S, was forced to resign his position with S in June 1974. S's counsel thereafter devised a plan designed to (1) allow for the redemption of T's 200,000 zero-basis S shares (which represented 20 percent of S's outstanding shares) without subjecting T to the tax consequences of sec. 1248, I.R.C. 1954, and (2) impose on T a more secure noncompetition restriction than it was thought could be obtained by a simple covenant requiring enforcement under state law. In general, sec. 1248 taxes as a dividend gain on the sale of shares in a foreign corporation where at any time within five years before the sale the stockholder owned 10 percent or more of the voting stock of the foreign corporation. As part of the highly complex plan devised by S's counsel, a Bahamian trust was established with T, his wife, and their children as beneficiaries. The trustee (W) was a Bahamian subsidiary of a holding company the stock of which was owned by some of the major banks of the world. Pursuant to the plan, T granted W an option in 1974 of approximately five years' duration to purchase his 200,000 S shares (which were converted from voting to non-voting) *432 at $15 per share. Also in 1974, S "loaned" to W $1,000,000 at 10 percent simple interest for approximately five years (subject to acceleration if T competed with S), with the parties intending that at the end of this time W would satisfy its "repayment obligation" of some $1,500,000 by conveying to S 100,000 of the 200,000 S shares it was to acquire from T. S placed no restrictions on W's use of the $1,000,000 or income therefrom during the term of the "loan". Under the terms of the trust instrument, T had a power of appointment, by will or deed, over the "Trust Fund", which power could not be exercised in favor of T, T's estate, or the creditors of T's estate. W was authorized to pay trust income for the "welfare care or comfort" of any one or more beneficiaries in its absolute discretion, and to lend the capital or income of the "Trust Fund" to a beneficiary without interest or security. T could remove the trustee without cause, provided he appointed a successor trust company which was organized and located outside the U.S. and satisfied certain minimum capital requirements. Held, irrespective of whether the 1974 transfer of $1,000,000 from S to W was a bona fide loan, T may *433 not be taxed on the $1,000,000 in 1974 unless he had unfettered control over it and may thus be said to have constructively received it at that time. Held, further, while the power of appointment afforded T a certain measure of benefit from the trust's assets in 1974, it precluded the appointment of such assets to T and thus did not give him unfettered control. Held, further, in the circumstances, W's powers as trustee may not be attributed to T.T's power to remove W without cause was restricted as to the qualifications of a successor trustee, and this diminished the likelihood that T could find a trustee which would automatically accede to his demands. Furthermore, although W was certainly open to, and perhaps even favorably disposed towards, suggestions from T or his representatives in respect of the disposition of trust assets, W was not a mere conduit for T. Therefore, T was not in constructive receipt of the $1,000,000 in 1974. Randall G. Dick and Suzanne Cutts Ritchie, for the petitioners. Michael R. Morris, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a $2,118,576 deficiency in petitioners' Federal income tax *434 for 1974. After concessions, the amount involved has been substantially reduced. The issue remaining for decision is whether a $1,000,000 "loan" made by a corporation in 1974 to a trust of which petitioners and their children were the beneficiaries, which "loan" was made pursuant to a plan for the corporation to redeem petitioner David Hart's zero-basis stock, must be treated in the circumstances of this case as payment for the stock and constructively received by him in 1974. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners David and Barbara Hart, husband and wife, timely filed their 1974 Federal income tax return with the Fresno, California, Service Center. At the time their petition was filed, they resided at Los Angeles, California. Unless otherwise noted, references to "petitioner" in the singular will be to David Hart. In 1961, petitioner became actively engaged in the plywood trading and importing business, and for a number of years he was employed by the largest plywood paneling importer in the United States. He became well acquainted with most of the major *435 plywood shippers, as well as with all of the major plywood importers in the United States. Petitioner's employer was the largest customer of Retla, Inc., a shipping company that leased or chartered vessels which it operated throughout the world. Retla, Inc., specialized in the carriage of tropical forest products and had acquired a virtual monopoly in the world-wide movements of those cargoes. It also carried steel products as well as other conventional bulk cargoes. In 1966, petitioner joined Retla, Inc., as assistant to the present. In view of his prior experience he worked initially with the plywood industry, in which he had considerable standing and recognition.He previously had lived in the Philippines, and after joining Retla, Inc., he spent a substantial amount of time in the Far East and Southeast Asia, dealing with plywood customers as well as developing new relationships with steel shippers.
Retla, Inc., was a California corporation. Pursuant to a reorganization of that company in mid-1971 a Liberian corporation called Steelwood Carriers, Inc. (Steelwood), was created and this corporation in turn established a wholly-owned Liberian subsidiary called Retla of Liberia, *436 Inc. ("Retla of Liberia"). Retla of Liberia then entered into an arrangement with Retla, Inc., to purchase substantially all of Retla, Inc.'s operating assets. Thus, Retla of Liberia survived the reorganization as the operating entity, until it was later merged into Steelwood. At that time, Steelwood's name was formally changed to Retla Steamship Company (its present name). In general, it will suffice here to refer to all of the corporations as "Steelwood" or "the company", unless otherwise noted. Petitioner was primarily responsible for the commercial or business side of the company, as distinguished from vessel, port operations, financial, and administrative matters. Over the years, he developed a close relationship with the company's principal customers in the carriage of tropical forest products. In addition, he was responsible for a separate Australian trading office. He also spent two years in New York City overseeing a brokerage subsidiary formed by the company. In 1971, the president and majority shareholder of the company, Marvin Malmuth (Malmuth), suffered a major heart attack. As a result, Malmuth sharply curtailed his involvement in the company, and petitioner *437 assumed full responsibility for the company's operations. In 1972, petitioner was made president of Retla of Liberia. He served in this capacity for approximately 20 months, until he was abruptly forced to resign from the company on June 10, 1974.This action apparently was prompted by a conflict in the management styles of petitioner and Malmuth, who once again had assumed control of the company's operations. In addition to his position as president of Retla of Liberia, petitioner was an officer, director, and shareholder of Steelwood. At the time he resigned his various positions with the company, he owned 200,000 shares of Steelwood's common stock, which represented 20 percent of the outstanding shares, and which had a zero basis in his hands. While these shares were valuable as a claim on the company's assets upon liquidation, there was no "market" for the shares because the company was closely held and the details of its activities were kept secret. Petitioner's only feasible or practical way of selling his shares was to have the company redeem them. While the company was not averse to acquiring the shares from petitioner in view of the perceived advantages of eliminating *438 a potentially-dissident minority shareholder, it was at the same time definitely interested in preventing petitioner from competing with it, since he had been its most prominent spokesman and he had close contacts with its customers. Therefore, the company was willing to redeem the shares provided that such redemption was accompanied by restrictions on petitioner's involvement in shipping activities. The initial negotiations in respect of the redemption were between petitioner and Malmuth. They agreed on a price of $15 per share, which figure reflected the company's "net worth projected to the end of 1974". They also agreed orally that petitioner would refrain from competing with Steelwood anywhere in the world for a period of three years. At this point, the task of reducing to writing the oral agreement reached by petitioner and Malmuth was left to Rufus v. Rhoades (Rhoades), who was then outside counsel to Steelwood and later became general counsel and vice president of the company. In the course of preparation of the necessary documentation by Rhoades, two considerations were regarded as of particular importance.The first was the necessity of providing an air-tight noncompetition *439 arrangement for the benefit of the company in view of petitioner's extensive contacts in the shipping world. The second related to the objective of avoiding on petitioner's behalf the impact of section 1248 of the Internal Revenue Code. Since petitioner owned 20 percent of the voting stock of Steelwood, a foreign corporation, it was understood that his gain on sale would have been taxable as a dividend in accordance with section 1248. [1] *441 On the other hand, it was perceived that if his voting stock were first converted to an equivalent number of non-voting shares, and if the sale were executed more than five years after such conversion, then the effect of section 1248 could be avoided, and the proceeds would be taxed under the more favorable capital gains provisions of the Code. At the same time, by casting the transaction in a form that might avoid the effect of section 1248, it was thought that the anticipated more favorable tax result for petitioner could be combined with enlarging the proposed noncompetition arrangement from three to five years and thus give Steelwood more extended protection from potentially serious competition. Rhoades proceeded to draft documents that would *440 achieve these results. One of the components of Rhoades' plan involved the establishment of a foreign situs trust on behalf of petitioner. However, in order to attain what were thought to be optimum results, Rhoades recognized that there could be a conflict of interest if he were to act on behalf of both the company and petitioner. Accordingly, upon Rhoades' recommendation, petitioner retained Elliot Steinberg (Steinberg) of the San Francisco branch of a Chicago law firm named Levenfeld, Kanter, Baskes & Lippitz (Levenfeld, Kanter). Rhoades and Steinberg were friends, and Steinberg had previously had experience in establishing off-shore trusts in the Bahamas. The plan conceived by Rhoades was highly complex, and involved a number of closely interrelated steps. In his view, a simple covenant against competition raised serious questions of enforceability under California law, which he sought to avoid through the involved mechanism devised by him. He preferred such course notwithstanding that only several years earlier the company and a departing minority stockholder-officer *442 had entered into a straighforward noncompetition agreement. Apart from the trust instrument, which was prepared by Steinberg or under his direction, the numerous documents were drafted by Rhoades. It is not feasible to set forth all of the possibly pertinent provisions of the documents in these findings, but they are incorporated herein in full by reference, and the following summary (including the establishment of the trust) will serve to provide the highlights of the various steps and the principal documents involved: 1. The Herrmann Trust. The instrument creating the trust which Steinberg arranged to be established is captioned "Deed of Settlement".It was dated September 18, 1974. The "Settlor" was stated to be Walter W. Herrmann and Alverta H. Herrmann, the parents of petitioner's wife. The trustee was Wobaco Trust Limited (Wobaco), a Bahamian corporation that was one of a number of corporations wholly owned (directly or indirectly) by a holding company the stock of which was in turn owned by some of the major banks of the world. Steinberg had previously dealt with Wobaco and with one or more of the corporations under the control of the holding company. He had a good relationship *443 with that group. The original corpus consisted of a $50,000 gift from Mrs. Herrmann. At all times relevant to this case the trust had no other assets apart from a $1,000,000 "loan" to it by Steelwood, hereinafter more fully described, together with any investments made with such funds or profits derived from the use of the funds thus subject to its administration. The trustee was authorized to pay the income "to the beneficiary or to any one or more of the beneficiaries * * * at any time or from time to time in any such amount as the Trustee in its absolute discretion shall think fit for the best interests or for the welfare care or comfort of such beneficiary or beneficiaries". The designated beneficiaries were petitioner and his wife and their issue. The Harts had two daughters, who were about 7 and 10 years old at that time. The trust instrument gave a power of appointment to petitioner during his lifetime and upon his death to his wife "over the Trust Fund" exercisable at any time by deed or will. Such power, as it related to petitioner, was limited only by the condition that it was not exercisable in his favor or in favor of his estate or creditors of his estate. Nothing *444 in the instrument precluded the exercise of the power in favor of the natural objects of his bounty. The trustee was also empowered to lend the capital or income of the trust fund to a beneficiary without interest and without security.Removal of the trustee by David Hart (and after his death by Barbara Hart) could be done without cause, provided that there was appointed a successor trust company which was organized and located outside the United States and which met certain minimum capital requirements. 2. "Option to Purchase Agreement". This agreement was dated September 24, 1974. The parties were petitioner (referred to as the "Optionor"), Wobaco (as trustee of the Herrmann Trust -- the "Optionee"), and World Banking Corporation Ltd. (a sister corporation of Wobaco -- the "Escrow Agent"). Pursuant to the agreement petitioner granted Wobaco an option to purchase his 200,000 Steelwood shares for $15 per share. The option was subject to strangely worded conditions (paragraph 7) that were seemingly irrelevant as between petitioner and Wobaco, but were the heart of Rhoades' plan to provide non-competition protection for Steelwood. Paragraph 7 provided that purchase of the shares *445 by the Optionee was "conditioned upon the Optionor's protection of the Optionee's interests * * * until July 1, 1979". And that "[i]f the Optionor engages in any act in a manner which is adverse to the interests of the Optionee * * * [the] condition shall have failed". The agreement then stated that the Optionor would be "deemed to have protected the Optionee's interests" if he "refrained from engaging in any capacity" in specified activities. Such activities, which were described in detail, were in essence such as might constitute or be thought to constitute competition or potential competition with Steelwood. The agreement further required (paragraph 9) that petitioner submit quarterly reports to Wobaco or its designee setting forth his current business activities and investments. (Such reports were in fact made to Steinberg, who in turn communicated with Rhoades to assure him that petitioner had not violated any of the conditions during the quarter in question.) The agreement also required that the Steelwood shares be placed in escrow with the "Escrow Agent", World Banking Corporation Ltd. Pursuant to this arrangement, all dividends on the shares were to be paid to the Escrow *446 Agent for delivery to Wobaco upon exercise of the option. Finally, the agreement stated that it "shall be construed in accordance with the laws of the Bahama Islands". [2]
3. "Loan Agreement". This agreement, dated September 27, 1974, [3] was between Wobaco, as trustee of the Herrmann Trust, and Steelwood. Pursuant to this agreement, Wobaco borrowed [4] $1,000,000 from Steelwood, giving as security only its interest in the Option to Purchase Agreement. The term of the loan was "approximately four (4) years and ten (10) months", with the principal and all interest (at the annual rate of 10 percent without compounding) due and payable on July 1, 1979, *447 and in default after November 15, 1979. [5] *449 No restrictions were placed on the trust's disposition of either the $1,000,000 or any accumulated earnings. The agreement provided that a default would occur in the event of the "cancellation, termination, modification, alteration, amendment, waiver, release, rescission, or failure of any condition or obligation" of the Option to Purchase Agreement "which shall become collateral security for this Loan." The loan agreement further provided: 7.Consequences of Default. Upon the occurrence of any Event of Default, * * * the Corporation at its option may accelerate the maturity date of the loan and declare the PROMISSORY NOTE [6] immediately (including principal and interest) due and payable. Waiver of any right arising in favor of the Corporation as a result of an Event of Default is not a waiver of any subsequent right arising from the occurrence of an Event of Default. 8. Prepayment. Except as set forth in this Paragraph, prepayment of any part or all of the principal amount of the PROMISSORY NOTE is prohibited. The Corporation will accept at any time in full satisfaction of its claim under the PROMISSORY NOTE an amount equal to the sum of *448 the principal of the PROMISSORY NOTE, plus the interest accrued to the date of prepayment, plus a prepayment charge consisting of the interest which would otherwise be payable from the date of prepayment until the maturity date of the PROMISSORY NOTE, plus thirty per cent (30%) of such unaccrued interest. 4. "Collateral Agreement", dated September 27, 1974. Under this agreement, Steelwood took a security interest in the Option to Purchase Agreement between petitioner and Wobaco, and Wobaco appointed Steelwood as its "attorney-in-fact" to exercise Wobaco's rights or do any other act necessary to "protect and preserve" the Option to Purchase Agreement. Furthermore, any violation by petitioner of the noncompetition restriction in the Option to Purchase Agreement was made an event of default under the Collateral Agreement, which *450 also resulted in acceleration of the Promissory Note. 5. "Guaranty Agreement", dated September 27, 1974, between petitioner (the "Guarantor") and Steelwood. Under this agreement, petitioner undertook to guarantee the payment and performance of Wobaco's indebtedness to Steelwood, including any prepayment charges. Steelwood was authorized, upon Wobaco's default under the Loan Agreement or Promissory Note, to proceed directly against petitioner to collect the indebtedness and to enforce any covenant or agreement, without first taking action against Wobaco. 6. "Pledge Agreement", dated September 27, 1974, between petitioner, Steelwood, and Levenfeld, Kanter (the "Pledge Holder"). Under this agreement, petitioner pledged his 200,000 Steelwood shares, to be held by Levenfeld, Kanter as pledgeholder as security for his obligation under the Guaranty Agreement. Thus, Steelwood was given the right, in the event of petitioner's bankruptcy or his failure to meet his obligations, to cause the pledgeholder to sell the shares after written declaration of default and notice of intention to sell. Such sale could be conducted at "a public or a private" sale. Petitioner and Levenfeld, Kanter *451 agreed not to "dispose of or otherwise deal with" the shares without Steelwood's prior consent. In the event of default Steelwood intended to cause the shares to be sold, and it assumed it would be the only purchaser at the sale. In Rhoades' view, "[w]e set up a series of documents, the net effect of which was that we would end up with Mr. Hart's stock one way or the other". The Pledge Agreement was inconsistent with the provisions of the Option to Purchase Agreement in that petitioner's shares were required by the latter agreement to be transferred to World Banking Corporation Ltd. as "Escrow Agent". The record is not clear as to who had physical possession of petitioner's certificates, but the foregoing inconsistency was later discovered at some undisclosed time, and when a "Modification of Option to Purchase Agreement" was executed under date of June 13, 1977 (see infra), all references to World Banking Corporation Ltd. as escrow agent were deleted, and substitutions were made so as to be consistent with the Pledge Agreement. 7. Redemption of Petitioner's Steelwood Shares. For purposes of arranging for the redemption of the 200,000 Steelwood shares which the trust was to acquire *452 from petitioner, the shares were divided into blocks of 100,000 each. The redemption of the first block, which was the subject of the "Stock Purchase Agreement" described in 7(a) below, was directly connected with the $1,000,000 loan from Steelwood to the trust. As an integral part of the redemption of this first 100,000 shares, Steelwood placed certain funds in escrow pursuant to an "Escrow Agreement" which is described in 7(b) below. Finally, the redemption of the second block of shares was arranged for in a "Stock Acquisition Agreement", as set forth in 7(c) below. (a) "Stock Purchase Agreement". This agreement, dated September 30, 1974, was between Wobaco, as trustee for the Herrmann Trust ("Seller"), and Steelwood ("Buyer"). In relevant part it provided as follows: WITNESSETH: WHEREAS, the Seller has entered into an OPTION TO PURCHASE AGREEMENT of even date here-with by and between the Seller and DAVID E. HART for the purchase of two hundred thousand (200,000) shares of non-voting common stock of Steelwood Carriers, Inc. (hereinafter referred to as the "Shares"); and WHEREAS, the parties hereto desire to provide for the disposition of such Shares; and WHEREAS, the Buyer *453 is authorized to purchase its own shares and has resolved to do so. NOW THEREFORE, in consideration of the foregoing the parties, intending to be legally bound, hereby agree as follows: 1. Purchase of Stock. Subject and pursuant to the conditions and terms hereinafter provided, the Buyer agrees to purchase a single block of one hundred thousand (100,000) shares of the Shares acquired by the Seller which right to acquire by the Seller is hereinafter referred to as the "Option". 2. Delivery of Shares. The Seller shall deliver said shares properly endorsed in favor of the Buyer within 180 days after the earlier of: (a) July 1, 1979, or (b) upon the death of David E. Hart. 4. Price. The price to be paid by the Buyer is the sum of: (a) Fifteen United States Dollars (U.S. $15.00) per share which the parties have determined to be the present value per share, plus (b) an appreciation factor of Eight and 33/100 United States Cents (U.S. $ .0833) per share per month commencing with the date of this Agreement, not to exceed Five United States Dollars (U.S. $5.00) per share during the term of this Agreement. (c) plus accrued earnings on the escrow account created under paragraph 5 hereof. *454 5.Security. As security for the performance of the purchase obligation of the Buyer, the Buyer hereby agrees to deliver Five Hundred Thousand United States Dollars (U.S. $500,000.00) to World Banking Corporation Ltd. pursuant to the document executed contemporaneously herewith, referred to as the ESCROW AGREEMENT, hereby incorporated by reference, for the uses and purposes contained in such document. 6. Conditions Precedent.
(a) The Buyer's obligation to purchase the Shares as set forth in Paragraph 1 hereof is specifically conditioned upon the continuing protection of the Buyer's interest. The phrase "protection of the Buyer's interest" has the same meaning as set forth in Paragraph 7 of the Option to Purchase Agreement after substituting throughout that Partagraph and Paragraph 8 thereof, "Buyer" for "the Optionee", and "David E. Hart" for "the Optioner". For the purpose of determining the continuation or failure of the aforedescribed condition, the provisions of said Paragraphs 7 and 8 (as amended hereby) are incorporated herein as if fully set forth hereat. (b) The obligation of the Buyer to purchase the Shares is specifically conditioned upon the Seller exercising the Option *455 referred to in Paragraph 1 herein and upon the Seller enforcing the provisions contained in said Option in order to protect the Buyer's interests during the period commencing with the date of this Agreement and continuing until the purchase price has been paid by the Buyer. If the Seller fails to exercise its Option or fails to enforce any and all of the provisions of the Option, then this condition shall have failed and the purchase obligation of the Buyer as set forth herein shall thereby be extinguished. (b) "Escrow Agreement". This agreement, dated September 30, 1974, was between Wobaco, as trustee of the Herrmann Trust ("Trustee"), Steelwood ("Corporation"), and World Banking Corporation Limited, the "Escrow Agent". In accordance with the terms of paragraph 5 of the Stock Purchase Agreement, Steelwood agreed to deliver $500,000 to the Escrow Agent. This sum was to be invested and reinvested by the Escrow Agent "from time to time in its sole discretion", and both the original sum and the investment proceeds were to be held by the Escrow Agent. The funds thus held in escrow were to be released under the following circumstances: (a) When and if the Trustee timely and validly delivers *456 the shares to the Corporation as called for in the Stock Purchase Agreement, then the Escrow Agent shall combine all said funds and pay them over to the Trustee as partial payment of the full purchase price, which price is set forth in said Stock Purchase Agreement. (b) If a condition described in Paragraph 6 of the Stock Purchase Agreement fails, the Escrow Agent shall combine and deliver all said funds to the Corporation wtihin thirty (30) days of notice of such failure received from the Corporation, provided that if Trustee notifies the Escrow Agent that it plans to arbitrate the issue of the failure of a condition, in which event the Escrow Agent shall continue to hold such funds until it receives a copy of the Arbitrators' award together with their instructions as to the distribution of the funds.
(c) In the event that the Seller as identified in the said Stock Purchase Agreement shall fail to deliver the shares as and in the manner described in said Agreement or for any other reason the obligation of the Corporation (identified therein as "Buyer") to pay the purchase price in whole or in part is terminated, the Escrow Agent shall immediately return to the Corporation that part *457 of the Purchase Price not paid to the Trustee. [7]
(c) "Stock Acquisition Agreement". This agreement, dated September 30, 1974, was between Wobaco, as trustee of the Herrmann Trust, and Steelwood. In a highly complicated manner, Wobaco was given an "option", subject to a condition precedent, to "put" to Steelwood up to 100,000 shares of Steelwood stock (the second block of shares). Nevertheless, even if the condition precedent to Wobaco's option coming into effect were satisfied, certain additional language limited Steelwood's obligation to purchase any shares in respect of which the option might be exercised. Thus, Wobaco's option was to be "effective and operable" no earlier than 12 months after completion of Steelwood's redemption of the first block of 100,000 shares pursuant to the Stock Purchase Agreement. The option price was stated as the lesser of the book value per share or an amount determined by a detailed formula, but in any event no more than $20 per share. At any time that the book value was below $15 per share, *458 Steelwood could defer its obligation to purchase any shares put to it by Wobaco, with payment of $15 per share to be made if and when the book value again rose to that level. However, the agreement placed further limitations on Steelwood's redemption obligation, in that the obligation could not exceed in any 12-month period the lesser of $500,000 or certain amounts over and above the cash flow requirements of Steelwood's business. The option could be exercised only once in each 12-month period, and it was to continue in effect until December 31, 1985. 8. "Call Option Agreement". Since Steelwood was thus bound, absent a breach of the noncompetition restriction, to redeem at least the first 100,000 shares pursuant to the Stock Purchase Agreement, a separate agreement was thought to be necessary and was in fact entered into to prevent Wobaco from backing out. It was captioned "Call Option Agreement", dated September 30, 1974, and was subsequently amended by a "Modification Agreement" dated October 28, 1974. Pursuant thereto, Wobaco, as trustee of the Herrmann Trust, granted Steelwood an option to purchase the 200,000 Steelwood shares it was to acquire upon the exercise of its rights *459 under the Option to Purchase Agreement. The call option was stated to be exercisable on or after the earlier of January 1, 1986, or "the cancellation, termination or failure of the option right created by the document entitled 'STOCK ACQUISITION AGREEMENT', of a date even herewith and by and between the Trustee and the Corporation". In paragraph 3(a) of the Call Option Agreement the option price was set at $15 per share for the "initial block or blocks of shares up to an aggregate of One Hundred Thousand (100,000) shares", while under paragraph 3(b) the price of the remaining shares would be the lesser of book value or an amount determined by a detailed formula which in any event could not exceed $20 per share. [8] However, as amended by the Modification Agreement of October 28, 1974, the Call Option Agreement provided that the call could be exercised "at any time" pursuant to a different price formula, as follows: Notwithstanding the foregoing the Corporation may purchase the shares at any time upon payment of the maximum price per share up to the first 100,000 shares so purchased as provided for in Paragraph 3(b) herein [i.e., the stated purchase price for the second 100,000 shares] *460 and on all remaining shares as provided in Paragraph 4 of that certain document entitled 'STOCK PURCHASE AGREEMENT' dated September 30, 1974 by and between the Corporation and Wobaco Trust Limited. 9. "Call on Residuary Interest". This agreement, dated September 30, 1974, between petitioner and Steelwood, was intended to serve as a sort of "backstop" to the Call Option Agreement. Thus, petitioner granted to Steelwood a call on the 200,000 shares in case Wobaco failed to acquire the shares from him pursuant to the Option to Purchase Agreement. The terms of this call option were substantially identical to those provided for in the Call Option Agreement, except that whereas the Call Option Agreement was concerned with a "cancellation, termination or failure" of the option right created by the Stock Acquisition Agreement, the Call on Residuary Interest was instead concerned *461 with such an event in respect of the Option to Purchase Agreement. At this point, at the risk of adding to the confusion and at the risk of oversimplification, it may be helpful to attempt to summarize [9] the confusing share prices and blocks of stock created by the interplay of the Stock Purchase Agreement, the Stock Acquisition Agreement, the Call Option Agreement, the Call on Residuary Interest, and the applicable modification agreements. Under the two call agreements, Steelwood could call all 200,000 shares at any time on or after October 28, 1974. [10] In such event, it was required to pay for each share, in simplified terms, the lesser of the book value or $20 reduced in accordance with a specified formula for the first 100,000 shares. For the remainder, the price was (1) $15 per share, plus (2) an "appreciation factor" of 8.33 cents per month per share from September 30, 1974, not to exceed $5 per share, plus (3) the accrued earnings on the $500,000 escrow account. If the shares were not called, Wobaco, after exercising its rights under the Option to Purchase Agreement, was to deliver the first block of 100,000 shares to Steelwood pursuant to the Stock Purchase Agreement within *462 180 (later expanded to 270) days after the earlier of July 1, 1979, or the death of petitioner. Steelwood was to pay $15 per share plus the "appreciation factor" stated above plus the earnings on the $500,000 escrow account, with this obligation to be offset in part by the trust's "liability" to Steelwood for repayment of principal and interest on the $1,000,000 "loan", and the remainder by the transfer to Wobaco of the funds in the escrow account. The second block of 100,000 shares, the subject of the Stock Acquisition Agreement, could be put to Steelwood in limited amounts beginning 12 months after completion of Steelwood's redemption of the first 100,000 shares, but Steelwood was not obligated to purchase any of these shares unless and until certain conditions in respect of its financial position were satisfied. The price per share was, in simplified terms, the lesser of book value or $20 reduced in accordance with a specified formula, and the option was to remain in effect until all of the shares were purchased or December 31, 1985. On or after January 1, 1986, or earlier if there were a "cancellation, termination or failure" of option rights created under either the Stock *463 Acquisition Agreement or the Option to Purchase Agreement, Steelwood could call any of the 200,000 shares which had not yet been redeemed, but now subject to a price formula different from that under the call "at any time" provisions that were added by the Modification Agreement of October 28, 1974. At this point, Steelwood was required to pay but a flat $15 per share for the first 100,000 shares so called, with the price per share for the remainder set at, in simplified terms, the lesser of book value or $20 reduced in accordance with a specified formula. 10. Coversion of the 200,000 Shares from Voting to Non-Voting. As noted previously, a necessary step in the plan to avoid the *464 tax treatment required by section 1248, I.R.C. 1954, was the conversion of petitioner's Steelwood shares from voting to non-voting shares. Although the record fails to disclose the date on which the conversion occurred, it could not have validly taken place prior to about mid-November of 1974. Thus, although Steelwood was issued a permit by the state of California on October 10, 1974, qualifying it to issue 200,000 shares of non-voting common stock, it was not until November 15, 1974, that the Liberian Minister of Foreign Affairs certified that Steelwood's certificate of incorporation had been amended on November 13, 1974, authorizing Steelwood to have outstanding non-voting common shares. As was pointed out in n. 5, supra, the November 15 date coincides with the "default date" written into the Loan Agreement by hand in place of the stricken July 31 "default date", and it therefore seems likely that the conversion occurred no later than shortly after November 15, 1974, so that the "sale" could be consummated soon after the November 15, 1979, "default date" without running afoul of section 1248. 11. At some point prior to February 1976, petitioner was seeking capital for an investment *465 opportunity and he consulted Steinberg and his associates at Levenfeld, Kanter to see about getting the desired funds from the trust. After communication with Wobaco, the funds were made available to petitioner through the trust's exercise of its option to purchase a portion of petitioner's Steelwood shares. There is no indication in the record that any attempt was made to obtain Steelwood's prior approval for this disposition of shares by petitioner as was required by the Pledge Agreement. Nevertheless, on February 2, 1976, Wobaco, as trustee of the Herrmann Trust, notified petitioner that it was exercising its "right" to purchase 10,000 shares of Steelwood stock in accordance with the terms of the Option to Purchase Agreement. The record does not disclose who then held the certificates representing these shares, or whether the certificates were actually delivered to Wobaco. [11] *466 On his 1976 Federal income tax return, petitioner reported a $151,390 [12] dividend under section 1248 in respect of this transaction. At an undisclosed time in 1977, petitioner again required investment capital and he again consulted Steinberg and others at Levenfeld, Kanter about obtaining funds from the trust. It was decided that Wobaco would purchase another 5,000 shares from petitioner, notwithstanding that the Option to Purchase Agreement provided that the option could be exercised in multiples of 10,000 shares only. Petitioner reported the proceeds of this sale as a dividend under section 1248. 12. Petitioner became aware during 1977 that Steelwood had suffered some business setbacks and that the book value of Steelwood's stock had dropped below $15 per share. He was concerned by this turn of events, because under the Stock Acquisition Agreement providing for Wobaco's conditional option to put the second 100,000 shares to Steelwood, Steelwood would never be obligated to redeem those shares unless the book value again reached $15 per share. Petitioner expressed his concerns to Malmuth, *467 and after some discussion it was agreed that Steelwood would purchase the second 100,000 shares directly from petitioner, one-half (50,000) in 1977 at $5 per share and the other half (50,000) in 1978 at $5.25 per share. Petitioner then approached his attorneys at Levenfeld, Kanter to pursue a release from Wobaco, as trustee of the Herrmann Trust, of its rights in respect of these shares under the Option to Purchase Agreement, in order to leave him free to sell the shares directly to Steelwood. Wobaco agreed to grant such release purportedly in exchange for a reduction from $15 to $10 of the option price on the remaining 85,000 shares. (At this point, Wobaco had already exercised its option to purchase 10,000 shares in 1976 and another 5,000 shares in 1977 -- see 11 above.) The arrangements thus made between petitioner, Wobaco, and Steelwood were reflected in the following documents: (a) "Modification of Option to Purchase Agreement".
This agreement, dated June 13, 1977, was between petitioner, Wobaco (as trustee of the Herrmann Trust), World Banking Corporation Ltd., and Levenfeld, Kanter. It states that in consideration for Wobaco releasing its option on 100,000 shares, petitioner *468 agreed to modify the Option to Purchase Agreement to (1) reduce the option price on the remaining shares to $10 per share, (2) allow the option to be exercised in multiples of 5,000 rather than 10,000 shares (which of course Wobaco had already done earlier that same year), and (3) extend the termination date of the option from December 31, 1979, to March 31, 1980. In addition, the modification agreement deleted all references to World Banking Corporation Ltd. as the escrow agent, substituting Levenfeld, Kanter in its place. [13]
(b) "Modification of Stock Purchase Agreement".
This agreement of June 13, 1977, between Wobaco (as trustee of the Herrmann Trust) and Steelwood amended paragraph (2) of the Stock Purchase Agreement to provide that Wobaco would deliver the shares to Steelwood within 270 days, rather than 180 days, of the earlier of July 1, 1979, or the death of petitioner. The reason for this change is not disclosed in the record, though it may be noted that it moved the latest date for delivery of the shares from December 28, 1979, to March 27, 1980, which roughly corresponds to the period by which Wobaco's *469 purchase option was extended in the Modification of Option to Purchase Agreement above. (c) "Redemption Agreement". This agreement of June 14, 1977, was between petitioner and Steelwood. It provided, consistent with the oral agreement between petitioner and Malmuth, that Steelwood would redeem 50,000 of its shares from petitioner at $5 per share. Both Steelwood's $250,000 payment and the delivery of the shares were to be concurrent with the execution of the agreement. The agreement further provided that for "a period of two (2) years from the date of this Agreement, the Seller [petitioner] shall not take any action or enter into any activity which competes with the Corporation [Steelwood]", thereafter, defining competition in terms similar to those contained in the Option to Purchase Agreement. The agreement also required that petitioner make annual statements to Steelwood or its designee setting forth his business activities, investments, etc., including the extent of any interest in an entity engaging in an activity competitive with Steelwood. (d) "Amendment of Call on Residuary Interest". This agreement of June 14, 1977, between petitioner and Steelwood reduced from 200,000 *470 to 85,000 the number of shares to which the call was subject, apparently in order to reflect the circumstances that Wobaco had already acquired 15,000 shares from petitioner and Steelwood was arranging separately to acquire 100,000 shares pursuant to the oral agreement between petitioner and Malmuth. (e) "Second Modification Agreement of Call Option Agreement". This agreement of an undiclosed date between Wobaco (as trustee of the Herrmann Trust) and Steelwood reduced from 200,000 to 100,000 the number of shares to which this call was subject, in accordance with the comparable reduction in the shares which Wobaco would acquire from petitioner. (f) "Cancellation of Stock Acquisition Agreement". This agreement of June 14, 1977, between Wobaco (as trustee of the Herrmann Trust) and Steelwood mutually cancelled the Stock Acquisition Agreement and the prior modification thereto. Since Steelwood was redeeming the second 10,000 shares directly from petitioner, Wobaco no longer needed an option to put the same shares to Steelwood. (g) "Pledge Agreement Amendment". This agreement of June 14, 1977, between petitioner, Steelwood, and Levenfeld, Kanter provided for the release as collateral *471 of 50,000 shares of Steelwood stock. (h) "Option Agreement". This agreement, dated August 22, 1977, was between petitioner and Steelwood. It provided each party with an option to cause a sale of 50,000 Steelwood shares from petitioner to Steelwood between January 1, 1978, and June 30, 1978, at a price of $5.25 per share. (i) "Pledge Agreement Second Amendment". This agreement, of February 15, 1978, between petitioner, Steelwood, and Levenfeld, Kanter provided for the release as collateral of another 50,000 Steelwood shares. (j) Petitioner's 1977 Federal income tax return shows a dividend under section 1248 of $325,145, which represents the proceeds of the sale of 5,000 Steelwood shares to the Herrmann Trust at $15 per share and 50,000 Steelwood shares to Steelwood at $5 per share. [14] Petitioner's 1978 Federal income tax return discloses a dividend under section 1248 of $269,450. The difference between this figure and the $262,500 purchase price of the 50,000 shares redeemed by Steelwood in 1978 is unexplained. 13. Although the loan from *472 Steelwood to the Herrmann Trust was "due" on July 1, 1979, and "in default" after November 15, 1979, these dates passed without any apparent action by Steelwood or any other party to conclude the transaction. As of December 10, 1979, BankAmerica Trust and Banking Corporation (Bahamas) Limited (hereinafter "BankAmerica"), the successor corporation and thus successor trustee to Wobaco, credited to an account in the name of "Retla Steamship Company" (Steelwood) $1,000,000 of "Principal" and $520,273.96 of "Interest" as "Proceeds Loan Repayment". Simultaneously, the account was charged $1,500,000 for "Cost of 100,000 shares Retla [Steelwood] at $15.00 Ea.", leaving a balance of $20,273.96. Next, by letter of December 18, 1979, BankAmerica, as trustee of the Herrmann Trust, notified petitioner of the exercise of its option to purchase his 85,000 Steelwood shares at $10 per share. Also on December 18, 1979, BankAmerica, as trustee of the Herrmann Trust, notified Rhoades, as representative of Steelwood, that "we are exercising our option to sell to you 85,000 Retla shares under the Stock * * * [Purchase] Agreement of 30th September, 1974, as amended". The 85,000 figure in this latter *473 communication appears to be in error. The trust had earlier purchased 15,000 shares from petitioner, and thus would have held 100,000 shares after purchasing the remaining 85,000 shares from him. Furthermore, BankAmerica charged Steelwood's account for the cost of 100,000 shares, and as will hereinafter appear, certificates representing 100,000 shares were later delivered to Steelwood in accordance with BankAmerica's instructions. On January 2, 1980, the promissory note which had been executed pursuant to the Loan Agreement was cancelled as having been paid in full in respect of both principal and interest. On January 4, 1980, BankAmerica issued a check to "Retla Steamship Company" (Steelwood) in the amount of $20,273.96, closing out the balance which remained in the company's account after the offsetting entries of December 10, 1979.
On February 4, 1980, pursuant to the instructions of BankAmerica, Steinberg forwarded to Steelwood for cancellation certificates representing 100,000 of the company's shares, 85,000 of which were in petitioner's name, and the remainder in the name of "Trunoms Limited", a subsidiary of the trustee. The record contains no information as to the disposition *474 of the escrowed $500,000 plus accured earnings thereon. The trust's receipt of $1,000,000 in 1974 was not reflected in any manner on petitioners' 1974 Federal income tax return. Petitioners reported their gains on the sales of Steelwood shares in 1976, 1977, and 1978 as dividends under section 1248, and they reported a capital gain in 1980 on the sale of the last 85,000 shares to the trust. In the notice of deficiency, the Commissioner determined that petitioners sold 200,000 Steelwood shares in 1974 at a gain of $3,000,000 and he sought to tax this entire amount in 1974 as ordinary income. The Government has now conceded that the maximum amount of gain which it seeks to include in petitioners' income in 1974 is the amount received by the trust from Steelwood in that year -- $1,000,000. OPINION What should have been a comparatively simply transaction, namely, the redemption of petitioner's Steelwood shares, was converted by a convoluted and involuted series of criss-crossing interrelated documents and steps into a legal nightmare. To thread one's way through this maze requires an exasperating amount of patience and diligence. [15] Yet, to change the metaphor, when all the smoke *475 has cleared away, the principal issue is simply whether petitioner -- a cash basis taxpayer -- had unfettered access in 1974 to the "loan" proceeds. During the history of the case, the situation was further complicated by the Commissioner's astonishing determination that $3,000,000 in proceeds was chargeable to petitioner in 1974, for by no stretch of the imagination was anything like $3,000,000 unrestrictedly available to petitioner in that year, or for that matter in any other year. Government counsel has wisely abandoned any such untenable position, and argues merely that the $1,000,000 "loan" to the Herrmann Trust in 1974 represented in substance immediate part payment for petitioner's shares and that the $1,000,000 was constructively received by petitioner at that time. The Government argues at length that there was no true "loan", and that in substance the transfer of $1,000,000 was nothing more than the first payment of the $1,500,000 purchase *476 price for the first block of 100,000 shares. If that's all there were to this case, there would be considerable strength to the Government's position, since the record strongly supports the contention that this was not a true "loan". We are satisfied that it was never contemplated that the "loan" would be "repaid". [16] *478 *479 Rather, it was anticipated that upon the lapse of at least five years, there would merely be offsetting book entries and the 100,000 shares would be delivered to Steelwood. Meanwhile, Steelwood was fully protected, not only by an ironclad assurance that it would get the shares, but also by effective means to enforce the noncompetition condition. Thus, it would not be difficult to reach the conclusion that in substance Steelwood merely paid $1,000,000 in 1974 as a first installment of the purchase price. [17] However, this would not be the end of the matter, for we must still reach the conclusion that the $1,000,000 paid to the Herrmann Trust was subject to petitioner's unfettered control in 1974 before it can be treated as income constructively received by him in that year. We therefore proceed to address that issue now, to determine whether, notwithstanding the Byzantine *477 nature of the transaction as structured, petitioner had unrestricted access to the $1,000,000 during 1974. In order to resolve this question our analysis must focus on the "Deed of Settlement" of the Herrmann Trust. As set out in our findings of fact, petitioner, his wife, and their issue were the sole beneficiaries of the trust, and the trustee was empowered in its absolute discretion to pay the income to any one or more beneficiaries "for the best interests or for the welfare care or *480 comfort of such beneficiary or beneficiaries". The trustee could also lend the capital or income of the trust fund to a beneficiary without interest and without security. Petitioner was given a lifetime special power of appointment over the trust fund, which was limited only in that it could not be exercised in his favor or in favor of his estate or creditors of his estate. Moreover, during his life petitioner could remove the trustee without cause, but in such event he was required to appoint a successor trust company organized and located outside the United States and of certain minimum capital requirements. Although petitioner's potential benefits under the trust instrument were vast, we think that, on its face, the trust instrument did not give petitioner unfettered access to any assets under the control of the trustee in 1974. The only power given to petitioner in respect of the trust assets was the special power of appointment, which specifically excluded from the universe of recipients petitioner, his estate, and the creditors of his estate. [18] *482 Of course, petitioner was thus free to appoint to anyone else, including the natural objects of his bounty, and in this respect *481 it may fairly be said that it was within his power to enjoy a considerable measure of benefit from the trust's assets in 1974. Still, a measure of benefit is not sufficient to place a taxpayer in constructive receipt; this requires that an amount be "set apart for him, or otherwise made available to him without substantial limitation or restriction." (Emphasis added.) Willits v. Commissioner,50 T.C. 602, 612 (1968); cf. Corliss v. Bowers,281 U.S. 376, 378 (1930) ("The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not.") Here, petitioner's enjoyment was restricted in a most fundamental way -- the assets could only be appointed to someone else. This, we think, is not unfettered control, and the special power of appointment therefore will not serve, by itself, to place petitioner in constructive receipt.
Whereas petitioner could not appoint trust assets to himself, Wobaco, as trustee, was clearly free to distribute trust assets to him or lend those assets to him without requiring security for repayment or the payment of interest. If Wobaco exercised its judgment independently in respect of these powers, then the mere possibility, or anticipated likelihood, that petitioner might benefit thereby would not constitute constructive receipt by him, for the necessary control would *483 be vested in Wobaco. The Government contends, however, that Wobaco was not an independent trustee. Initially, the Government notes (without pressing the point) that petitioner could replace Wobaco as trustee without cause. While it may be that in certain circumstances powers given to a trustee may instead be attributed to one who may replace the trustee without cause, see e.g. Corning v. Commissioner,24 T.C. 907, 913 (1955), affd. 239 F.2d 646 (6th Cir. 1956), petitioner's rights in respect of the appointment of a successor trustee were too narrowly circumscribed to allow for the application of that rule here. The Deed of Settlement of the Herrmann Trust required that any trustee appointed to replace Wobaco be a company of certain minimum capital requirements organized and located outside the United States, and we are not convinced of the certainty, or even substantial likelihood, that petitioner could find such a trustee which would accede to his demands. Compare Corning v. Commissioner,supra,24 T.C. at 915.In the circumstances of this case, the mere fact that petitioner could replace the trustee without cause and appoint a similarly-situated successor trustee does not convince *484 us that he should be clothed with the powers granted to the trustee by the trust instrument. Aside from its assertion in respect of petitioner's power to replace the trustee, the main thrust of the Government's attack on the trustee's independence is that the particular trustee chosen, Wobaco, was "pliable". As evidence of this pliability, the Government sought to demonstrate at trial that Elliot Steinberg, who represented petitioner in this transaction and whose firm drafted the the Deed of Settlement of the Herrmann Trust and recommended Wobaco as trustee, had previously exercised a degree of influence over Wobaco in the performance of its duties as trustee of a trust created by Sidney B. Stern, another client of Steinberg's. Thus, the Government questioned Steinberg at some length as to the truth of selected statements which appear in the findings of fact of Stern v. Commissioner,77 T.C. 614 (1981), on appeal (9th Cir., Mar. 4, 1983). Based solely on the answers given by Steinberg in the trial of this case as to his independent recollection of the transactions at issue in the Stern case, and without any reliance on the findings of fact set forth in Stern v. Commissioner,supra,77 T.C. at 616-636, *485 we find as fact that Steinberg had an established and cordial business relationship with Wobaco of some several years duration at the time that Steinberg undertook to represent petitioner in 1974. In addition, in at least one instance in 1972 Steinberg suggested that Wobaco take a certain step in its role as trustee of a trust involved in Stern and Wobaco in fact took such action some several months later. Nevertheless, the testimony elicited from Steinberg in this case is insufficient to establish that Wobaco was a mere conduit for petitioner and that it would automatically comply with any request of petitioner for funds, either by way of distribution, or loan, or purchase of Steelwood shares. Certainly Wobaco was not going to turn a deaf ear to suggestions from petitioner or Steinberg as to its handling of the assets in the Herrmann Trust, and indeed we think that Steinberg would not have recommended Wobaco if he thought otherwise. On the other hand, a mere willingness to listen to and consider ideas and proposals is not commensurate with an abdication by Wobaco of its duty to exercise its independent judgment. We think that the Government's probe into Steinberg's past interaction *486 with Wobaco failed to show in this instance that independent judgment would not be exercised, notwithstanding our view that Wobaco would be disposed to give favorable consideration to requests made by Steinberg and petitioner to the extent that they were within the range of permissible discretion accorded to a trustee under applicable local law. The record in Stern is not before us; instead, Steinberg's testimony in this case provides but fragmentary glimpses of the transactions at issue in Stern, and try as the Government might it cannot assemble the given pieces into a convincing picture of Wobaco as a completely subservient agent of Steinberg and his clients. Our conclusion in this respect is unchanged by the trust's purchases of Steelwood shares from petitioner in 1976, 1977, and 1980. It is true that both the 1976 purchase of 10,000 shares and the 1977 purchase of 5,000 shares were made by Wobaco after Steinberg or others at Levenfeld, Kanter communicated with it on behalf of petitioner. Nevertheless, despite Wobaco's favorable disposition toward requests from petitioner, it had the power to reject any and all requests as it saw fit, and the record presented simply does not *487 establish that Wobaco's decision-making power was not exercised in these instances. [19] *488 The situation in respect of the 1980 purchase of 85,000 shares at $10 per share is somewhat different. The trust was initially given an option to purchase these shares at $15 per share, but the option price was dropped to $10 per share in 1977 at the same time that the trustee released its option on the second 100,000 shares. The Government interprets this circumstance in a somewhat confusing manner, asserting that the trustee breached a fiduciary obligation to petitioner as a beneficiary by causing him to sell shares to the trust for $10 per share and then immediately reselling the shares to Steelwood for $15 per share. Whatever the motivation for this arrangement, [20] it does not establish the lack of independence on the part of the trustee. Petitioner, dealing with the trust as a third party, allowed the trust to make a $5 per share profit on this transaction, which profit accrued to himself and his family as the beneficiaries of this trust. This, we think, was not a breach of any *489 fiduciary obligation which the trustee owed petitioner. Furthermore, the record does not disclose that the trustee's participation in the transaction resulted from anything other than an exercise of its discretion, and we are not persuaded by the Government's arguments to the contrary. Although the burden of proof was upon petitioner, at least a prima facie case was made out on his behalf when it was shown that the trustee was a presumably reputable trust company that was controlled by some of the major banks of the world, and we cannot assume in the absence of persuasive evidence that it would not faithfully discharge the fiduciary duties imposed *490 upon it by law. In our opinion the evidence presented to overcome this prima facie case does not do so. While we recognize the possibility that there may have been an understanding, explicit or implied, that the trustee would make available to petitioner on demand any of the assets in the trust requested by him at any time by way of distribution, or interest-free loan, or purchase of Steelwood shares, or in any other manner, we cannot make any such finding on this record.[21] And in the absence of such finding, or a finding that Wobaco was a pliable trustee that would accede without question to any request for funds made by petitioner, we are constrained, without great confidence, to conclude on the record before us that petitioner was not in constructive receipt of the $1,000,000 "loan" from Steelwood to the trust in 1974. Because of concessions, Decision will be entered under *491 Rule 155.
Footnotes
1. SEC. 1248. GAIN FROM CERTAIN SALES OR EXCHANGES OF STOCK IN CERTAIN FOREIGN CORPORATIONS. (a) General Rule.--If-- (1) a United States person sells or exchanges stock in a foreign corporation, or if a United States person receives a distribution from a foreign corporation which, under section 302 or 331, is treated as an exchange of stock, and (2) such person owns, within the meaning of section 958(a), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation at any time during the 5-year period ending on the date of the sale or exchange when such foreign corporation was a controlled foreign corporation (as defined in section 957), then the gain recognized on the sale or exchange of such stock shall be included in the gross income of such person as a dividend, to the extent of the earnings and profits of the foreign corporation attributable (under regulations prescribed by the Secretary) to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock sold or exchanged was held by such person while such foreign corporation was a controlled foreign corporation.
2. At trial, petitioner referred to a $30,000 "option payment", presumably a charge for the granting of the option, but the "Option to Purchase Agreement" makes no mention of any consideration for the option. In the notice of deficiency, the Commissioner included this $30,000 in petitioners' 1974 income, but the Government did not address this item on brief and we assume it has been abandoned as part of the concession which limited the issue to the consequences of the $1,000,000 "loan" received by the trust in 1974, hereinafter described.↩
3. This agreement and at least some of the other documents involved which bore different dates were executed at the same time on a date undisclosed in the record. ↩
4. Terms such as "loan", "borrow", "purchase", etc., are used in these findings only to describe the formal structure of the transaction at issue, without any finding at this point as to the effect of the transaction for Federal income tax purposes or as to whether any particular step constituted a bona fide "loan", etc. ↩
5. The default date was typed as July 31, 1979. However, at some undisclosed time, "July 31" was stricken by hand and "November 15," was substituted and initialed in the margin. As thus changed, the modified date coincided with the date of the certification of the Minister of Foreign Affairs of Liberia to the effect that the Certificate of Incorporation of Steelwood had been amended on November 13, 1974, authorizing the issuance of nonvoting shares.Thus, if petitioner had exchanged his voting shares for non-voting shares immediately thereafter, the 5-year period required to avoid the impact of section 1248↩ could not have expired any earlier than about mid-November 1979. 6. An unexecuted copy of the "Promissory Note" is attached to the Loan Agreement. It states that Wobaco promises to pay Steelwood $1,000,000 - with simple interest computed thereon from the date of this Note [September 27, 1974] at the rate of ten per cent (10%) per annum until said principal sum is fully paid; said interest and principal sum being payable, in full, in one payment on July 1, 1979.↩
7. Paragraph (c) was added by a "Modification Agreement" executed by Wobaco, Steelwood, and World Banking Corporation Limited under date of October 15, 1974.↩
8. The detailed formula here was identical to the formula used in the Stock Acquisition Agreement; thus, the price to be paid by Steelwood for the second 100,000 shares it called was the same price it was to pay when and if Wobaco put this second 100,000 shares to Steelwood under the Stock Acquisition Agreement.↩
9. To the extent that this attempted summary may possibly be at variance with the documents themselves, the latter are to be regarded as controlling for purposes of these findings.↩
10. Under the Call on Residuary Interest, all of the shares could be called from petitioner at any time on or after September 30, 1974. Nevertheless, the comparable provision for an immediate call from Wobaco was not in the original Call Option Agreement, but was added by the Modification Agreement of October 28, 1974 (p. 24, supra↩).
11. As will hereinafter appear, see p. 38, certificates representing these 10,000 shares and 5,000 shares purchased by Wobaco from petitioner in 1977 were at some point reissued in the name of a subsidiary corporation of the trustee. 12. Petitioner testified that the $1,390 excess over the $15 per share purchase price represented a portion of the $30,000 "option payment" referred to in n. 2, supra.↩
13. This modification rectified the inconsistency noted at p. 18, supra.↩
14. The excess of $145 is unexplained, but it perhaps represents an allocated portion of the "option payments' discussed in ns. 2 and 12, supra.↩
15. Our task was made more difficult by the anemic character of the stipulation of facts filed by the parties, who merely dumped upon us a mass of documents without any attempt to set forth any coherent account of what in fact had occurred.↩
16. Although the transfer was in form a loan, Steelwood assumed that this sum would remain the property of the trust or petitioner and, together with the $500,000 placed in escrow and the earnings on both amounts, would serve as payment for the redemption of 100,000 of petitioner's shares. The "net effect" of the transfer was that Steelwood would "end up with Mr. Hart's stock one way or the other" (see p. 18, supra), which meant that the "loan proceeds" would never be returned to Steelwood. In order to constitute a loan, "[t]he parties must have entered into the transaction with the intention that the money advanced be repaid", Commissioner v. Makransky,321 F. 2d 598, 600 (3d Cir. 1963); see also Moore v. United States,412 F. 2d 974, 978 (5th Cir. 1969), and this was not the case here. While it is true that there were present here two of the normally expected characteristics of a loan -- a fixed maturity date and a provision for interest --, there is other, more compelling evidence that a loan was not intended. For example, foreclosure on the collateral (petitioner's shares) represented merely a consummation of the desired sale rather than a preliminary step to recovery of the transferred funds. In addition, in the absence of the redemption no loan would have been made, and this "interdependence" has been thought to negate the existence of a loan. Cf. United States v. Williams,395 F. 2d 508, 511 (5th Cir. 1968); Blue Flame Gas Co. v. Commissioner,54 T.C. 584, 596 (1970); Greenfield v. Commissioner,T.C. Memo 1982-617. Moreover, the "arithmetic of the transaction is particularly damaging" to the loan contention, Blue Flame Gas Co. v. Commissioner,supra,54 T.C. at 596, in that the repayment obligation was intended to be equal to the agreed value of the shares, with payment to be made merely by offsetting bookkeeping entries. It is true that the trust paid an additional $20,273.96 of "interest" due to the delay in completing the transaction; however, this circumstance arose not by plan or agreement, but only because, in contrast to the expected procedure for an arm's-length loan, the stated "due date" and "default date" were ignored. In sum, the evidence persuasively suggests that there was not in fact a bona fide loan to the Herrmann Trust. However, in view of the result hereinafter reached, it is unnecessary for us to rule upon this point. 17. Petitioner places much emphasis upon the contingency that the funds would have to be returned to Steelwood in the event of a breach of the noncompetition condition.However, if the receipt of the funds would otherwise constitute income, the mere fact that they might later have to be returned would not alter the conclusion that they represented income in the first instance. The situation would merely be a variation of the familiar claim of right doctrine.Cf. North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932); Nordberg v. Commissioner,79 T.C. 655, 664-665 (1982); Professional Insurance Agents of Michigan v. Commissioner,78 T.C. 246, 270 (1982); Woolard v. Commissioner,47 T.C. 274, 279↩ (1966).
18. Though the Government has not raised the point, it could be argued that this choice of language left petitioner free to appoint to his creditors during his lifetime, and if so it is not difficult to envision a scheme by which he might be able to benefit himself indirectly even though expressly prohibited by the trust instrument from accomplishing the same in a direct manner. Compare sec. 2041, I.R.C. 1954↩, under which a power to appoint to one's creditors while alive would cause inclusion of the assets subject to the power in one's gross estate. Nevertheless, though we find this potential "loophole" troubling, the Government has not asserted this rationale as a basis for contending that petitioner was in constructive receipt of the $1,000,000 in 1974, and it is not at all clear to us that petitioner could thus indirectly circumvent the apparent intent of the Herrmann Trust's "Settlor" as expressed in the restrictions which were in fact placed on the power of appointment.
19. As petitioner testified at trial, the funds which he desired to obtain from the trust in 1976 and 1977 for investment purposes could have simply been distributed to him or loaned to him without interest rather than paid to him pursuant to the purchase of Steelwood shares from his under the Option to Purchase Agreement. Since a distribution or loan may well have caused him to incur no immediate tax consequences, while the sale of shares in 1976 and 1977 resulted in dividends in those years under sec. 1248, it may seem surprising that this avenue was chosen. However, the record discloses that these dividends, which represented the great bulk of the petitioners' income in 1976 and 1977, were offset to a substantial extent by large deductions in each of those years. Thus, petitioners applied a deduction of $73,972 against a dividend of $151,390 from the sale of 10,000 Steelwood shares in 1976, and a deduction of $221,506 against a dividend of $325,145 from sales of 55,000 Steelwood shares in 1977 (this includes the 50,000 shares sold directly to Steelwood). It is not at all clear, then, that the income taxes paid on these dividends in 1976 and 1977 were greater than, or even as great as, the taxes that would have been paid if the proceeds had been received instead as capital gains in 1980.
20. We cannot overlook the fact that as a result of the $5 per share drop in the option price petitioner had a capital gain of only $850,000, rather than $1,275,000, to report on his Federal income tax return in 1980. Of course, the $425,000 difference remained in the trust and thus was not subject to petitioner's unfettered control, notwithstanding that he had a measure of control through his power of appointment (and notwithstanding that he and members of his family, the normal objects of his bounty, were the sole beneficiaries of the trust).↩
21. Nor can we find on this record that any assets in the trust were irrevocably set apart for petitioner such that the only restriction on availability was the passage of time, as may be the case when funds are placed in escrow, cf. Reed v. Commissioner,45 T.C.M. 398↩, 400, 51 P-H Memo T.C. Par. 82,734 (1982).