## COMMISSIONER OF INTERNAL REVENUE v. MONTGOMERY (two cases).

### Nos. 10911, 10912.

Circuit Court of Appeals, Fifth Circuit.

July 20, 1944.

was assignable, and that the profit accruing after the assignment belonged ·to the corporation, which was organized legally and in good faith, and whose separate entity could not be ignored. 1 T. C. 1000. We are asked to overrule this decision and to sustain the Commissioner.

The contract is one whereby Montgomery, as contractor, agrees to provide all materials and perform all work for the construction of a building as shown by the drawings and specifications of named architects, under whose direction and according to whose decisions the work is to be done. The exterior was to be completed by June 6, 1936, and the whole contract by Aug. 30, 1936, with liquidated damages of $150 per day for delay. A bond was given for performance of the contract. Payments were to be made twice per month on the architects' certificates of the work done. It is not found what work had been finished by June 30, and what remained to be done, but the whole was not completed till sometime in September. The profits on the work completed to June 30 were returned by Montgomery at $86,009. The profits on work done afterwards, $80,209, were returned by the corporation. These figures are not in dispute.

The corporation was regularly formed under Texas law by Montgomery, his wife, and his brother, who were created the directors. Three shares of Class A stock, which had the power of voting in all matters coming before a shareholders' meeting, were authorized, Montgomery subscribing for two shares and his wife one. Ninety-seven shares of Class B stock were authorized, and one taken by the brother. The remainder was issued thirty-two shares each to the three children of Montgomery. These shares could vote only on certain extraordinary matters as provided by Texas law. The par value of each was $10, and Montgomery paid for that issued to the children. The life of the corporation was fifty years. It was authorized to build and repair buildings and to own and prepare materials therefor. It made two or more unsuccessful bids for other contracts, but ceased doing business and was dissolved in October, 1938. Until then it kept books, paid corporation taxes, held corporate meetings and kept corporate records, and functioned in a normal manner. Mont-

Helen R. Carloss, Sewall Key, J. Louis Monarch, and Ray A. Brown, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bur. Int. Rev., and Claude R. Marshall, Sp. Atty., Bur. Int. Rev., both of Washington, D. C., for petitioner.

Allen Charlton, of Dallas, Tex., for respondent.

Before SIBLEY, HUTCHESON, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

P. O'B. Montgomery is a construction engineer residing in Texas. In his income tax return for 1936 * he showed income from five construction contracts, the largest being with the State of Texas, for building the State Hall, for the Texas Centennial Exposition. This contract during the course of its execution was on July 1, 1936, assigned to a corporation, P. O'B. Montgomery, Incorporated, which returned as its income profits thereafter arising from the execution of the contract. The Commissioner determined that the entire profit on the contract was taxable to Montgomery, and assessed a deficiency accordingly. The Tax Court held that the contract was not for the personal services of Montgomery,

---

* The income was really that of his marital community. His wife's share is dealt with in the case of Commissioner v. Frances H. Montgomery, heard and decided herewith.

gomery was president and general manager, and his wife secretary, but neither was paid any salary. The profits arising from the assigned State contract were regularly returned as income by the corporation, and dividends were regularly declared to the stockholders and returned for them as their income. Those going to the Montgomery children ultimately went into a trust for their benefit.

After the contract was assigned on July 1, the corporation took over the business, including the bookkeeper, several construction engineers, and the workmen, conducting everything as Montgomery had previously done. It is testified he himself did about what he had done before, but it is not stated what that was. He had other construction jobs besides the one assigned. The consideration expressed in the assignment was "$1.00 and the assumption by P. O'B. Montgomery, Inc., of all the losses and liabilities that may hereafter arise in connection with the performance of the contract". No consent to the assignment by the State appears.

■ We agree with the Tax Court that the contract was assignable. It did not employ Montgomery as an engineer, or require any personal service of him. It was a business contract to furnish labor and material and deliver a finished building. If Montgomery had died his administrator would be bound to perform. The contract indeed expressly binds "the said parties, their heirs, successors, executors, administrators *and assigns*", showing that assignment was contemplated. It may be, however, that Montgomery, without the special consent of the State, would not by his assignment be relieved of his personal liability, and hence the assumption by the assignee of all "losses and liabilities" was not meaningless, but a real consideration.

The Tax Court has found also that the corporation was legally and regularly organized, for no fraudulent purpose, and with a small but fully paid in capital; that it performed this contract, earned and accounted for the profit made, and attempted to secure other contracts. It lasted over two years before it was abandoned. Must it, as a matter of law, be ignored for income tax purposes?

■ The general rule is that for such purposes the corporate entity is to be recognized, even when wholly owned by persons who would otherwise be taxed. Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397; Burnet v. Commonwealth Imp. Co., 287 U.S. 415, 53 S.Ct. 198, 77 L. Ed. 399; Planters' Cotton Oil Co. v. Hopkins, 286 U.S. 332, 52 S.Ct. 509, 76 L.Ed. 1135. Here the corporation is owned principally by stockholders other than Montgomery. It cannot be said that he and it are practically one. If we would attempt to look through the corporation we would mainly see not this taxpayer, but his children. As the Tax Court says, Montgomery and his wife were moved to make a gift to their children in creating the corporation. Whether they gave them merely the $960 which they paid in for the stock, or a more valuable interest in the State Hall contract, might be a question touching gift taxation, but is not the question here. Though the contract seemed profitable on July 1, when assigned, it might have proven otherwise. Fire, storm, strikes, or other causes might have produced a loss. If it had, it would have been the business loss of the corporation, and not available to Montgomery to reduce the profit he had made before July 1. So also the profit, whether the contract be regarded as a gift or a thing sold to the corporation, was not Montgomery's profit personally.

If the income had been pay for Montgomery's personal services the case would be otherwise, for by no sort of assignment or prior arrangement, which is not a bona fide hiring or partnership, can one be divorced from his personal earnings as his taxable income. Lucas v. Earle, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Jones v. Page, 5 Cir., 102 F.2d 144; Saenger v. Commissioner, 5 Cir., 69 F.2d 631. Montgomery continued to supervise the business, but how much time he gave to it does not appear. What the State paid was not as compensation for his time and effort, but for the materials and labor and the building that was produced. If anyone owed him for his services it was the corporation for which he acted.

■ The case is not like Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655, where a man cut coupons from a bond shortly before due and gave them to his son, and the coupons were held to be the income of the owner of the bond; nor like Helvering v. Eubank, 311 U. S. 122, 61 S.Ct. 149, 85 L.Ed. 81, where insurance renewals, already earned, were assigned gratis to be collected, and were

held to be still the assignor's income. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, is also cited, but that involved a short term declaration of trust for the benefit of declarant's wife, over which he had full control, she having no power of disposal, and the reversion being to himself. Montgomery made no short term gift to his children with reversion to himself. He gave absolutely and finally the shares of stock. The control he and his wife had over the corporation was in their right as stockholders and directors, and subject to the law regulating those relationships, and to the power of a court of equity if abused. A lawfully organized and operated business corporation is not the equivalent of a trust.

Here, whether by gift or sale, Montgomery on July 1 disposed of the contract finally and absolutely, "the tree and its fruits", reserving nothing to himself. His only benefit is his slight stock ownership. Compare Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465. We think the prosecution of the work after July 1, though it had apparently been well organized before, was a business, one within the corporation's charter powers, and attended with business risks, and that its profits belong to the corporation. That the corporation was organized through a gift of money by Montgomery to his children, and that he has to some extent since served it without charge, does not alter the matter. The judgment of the Tax Court is according to the law, and is in both cases

Affirmed.

HUTCHESON, Circuit Judge (dissenting).

I have no quarrel with the conclusion of the Tax Court and of my brothers that the fact alone that P. O'B. Montgomery, Inc., created by taxpayer to receive formal transfer of his contract was in name and in fact Montgomery's alter ego and under his complete domination and control, would not of itself require a finding that the corporation was a mere fiction and its entity must be disregarded. I do not doubt that Montgomery could have formed the corporation to really take over his construction contract, and, having formed it, could have made a real assignment of the contract to it with the right in the corporation to earn such part of the profit on the whole job as had not already been substantially earned. Neither, if he had really done

this, would I have any doubt that his frankly avowed purpose to lighten his income taxes would not make income taxable to him which was in fact and in law the income of the corporation. But these are academic legal postulates without possible application to the undisputed facts of this case. What is under fire here is a series of pretenses masquerading as realities. A pretense that a corporation was formed for the purpose of relieving Montgomery of the burdens and obligations of the contract. A pretense that Montgomery's old organization which continued to perform the contract was the corporation's organization. A pretense that the corporation was really the earner of any of the profits due to the performance by Montgomery and his organization of the contract. Finally, there is the collosal pretense that though Montgomery, with an expenditure of $575,000.00 had earned only $86,000.00, the corporation, with an expenditure of $76,000.00, had earned $80,000.00. What is in question here is whether a taxpayer's action in transferring profits already largely earned, action taken with no other purpose then to lessen his income tax, can succeed when the undisputed facts show, as here: that the taxpayer was to turn over to it not the construction of the building but a part of the profits due and to become due to the taxpayer when the construction was completed; that to accomplish this purpose the taxpayer went through the form of calling into putative being a corporate creature, bearing his name, officed and managed by him; and that having done this he arbitrarily apportioned to it substantially one-half of the profits though when the device was determined upon all the profits had been largely, if not completely, earned. I am in no doubt that the law is not so hooded that it cannot see through a device so transparent. I am in no doubt that it is not so impotent that it cannot strike it down. It is quite plain, I think, that the Tax Court and my brothers have looked on the case with gaze so foreshortened by their preoccupation with sound but inapplicable legal postulates that they have entirely failed to see the glaring discrepancy between what the taxpayer had the right to do and what he in fact did. He had a right to assign an unfinished construction contract with the right in the assignee to such profits as it might earn under the contract. He did not have a right, under the guise of assigning the contract, to assign profits already substantially earned under

it. That this is the cause for the error is made plain by the statement my brothers make as to the Tax Court's holding. They say: "The Tax Court held that the contract was not for the personal services of Montgomery, was assignable, and that the profit accruing after the assignment belonged to the corporation, which was organized legally and in good faith, and whose separate entity could not be ignored. * * * We are asked to overrule this decision and to sustain the Commissioner." Again they say: "It is not found what work had been finished by June 30, and what remained to be done, but the whole was not completed till sometime in September.[1] The profits on the work completed to June 30, were returned by Montgomery at $86,009.00. The profits on work done afterwards, $80,209.00, were returned by the corporation. These figures are not in dispute". The defect in this statement is that, by the undisputed facts of record,[2] these figures as to profits are inherently in dispute. They destroy themselves. It is obvious from these figures that if the work had progressed to a point on June 30, where only $76,000.00 remained to be spent, the $80,000.00 coming to the contractor over and above that expenditure had already been largely earned. If we assume, as we must because there is no evidence to the contrary, that the profit on the job was the same throughout, and take $76,000.00 spent after July 1st, as against $575,000.00 spent before, it is quite clear that the apportionment of the $166,000.00 of profit was grossly incorrect. But the conclusion from these figures is not that there should be a reapportionment of the profit: it is that the whole transaction was an unreal one, that Montgomery had substantially finished his job, substantially earned the profit, and that the purpose and effect of what he did was to create the corporation to transfer to it, not the contract but the profits from it. The case is ruled by Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319, and three cases from this court, Jones v. Page, 102 F.2d 144, Esperson v. Commissioner, 49 F.2d 259, Atkins v. Commissioner, 76 F.2d 387. My brothers misapprehend the rationale of the decision in the Jones case. While it did involve personal earnings, it also involved the assignment of a valuable contract for an insignificant sum. We said [102 F.2d 145]:

"Conceding that a taxpayer has the right to decrease the amount of his taxes or to avoid them by legal means, in every instance where that is attempted, a court may look through the transaction and determine whether it is legal or violates the intent of the statute. It would be absurd to say that any reasonable man having a contract from which he was to receive a minimum of $100,000 would in good faith transfer it to another for merely $6,000. Appellant could have set up the trust in favor of his children without the intervention of his father." (here the corporation) "The conclusion is inescapable that he used his father" (here the corporation) "simply as a conduit."

But if the view of the Tax Court and of my brothers, that there was a real attempt to transfer the contract and not merely to transfer the profits were accepted, this would not help the taxpayer. The commissioner determined that the profits were earned not by the corporation but by him,

---

[1] The uncontradicted evidence is that the work was completed about the first of September.

[2] The contract, dated December 30, 1935, was on a base bid of $993,000 with specified deductions. It provided that the sum to be paid was $776,328, subject to additions and deductions as hereinbefore provided. It provided for payments on monthly certificates of the architect in the sum of 85 per cent of the work performed and materials in place or on the site, the remainder upon final completion and acceptance of the work. It provided that the exterior of the building would be completed on or before June 6, and the entire contract would be completed within 8 months, that is by September 1, 1936. The record does not contain a statement of payments made from time to time to Montgomery, but it shows that by some method not disclosed the taxpayer showed in his income tax return income from the contract up to July 1, 1936, $661,108.65, construction cost $575,099.06, and a profit of $86,009.59. By the same figurers, the corporation was credited with gross income from the work of $156,404.12, charged with construction cost of $76,194.25, with a resulting profit of $80,209.87. No explanation is offered as to why the proceeds are apportioned this way. There is a mere statement that Montgomery and his auditors apportioned the costs and the profits so that for the expenditure of $76,000, the corporation received $80,000 of profits and for the expenditure of $575,000 Montgomery received substantially the same.

318

and that they belonged to him. The undisputed evidence shows that at least as to the greater part of the profits this was so. It then became the taxpayer's burden to overthrow this determination by a definite and precise showing as to the part of the profits which had not been earned by him but by the corporation. He made no attempt to do this except by the arbitrary and completely unreal figures he set up, and not having done so, he failed to overthrow the commissioner's determination. The decision of the Tax Court should be reversed. I respectfully dissent from its affirmance.