OPINION The first issue for decision is whether the purported loan to petitioner in fact represented advance rentals taxable to petitioner and Blue Flame and, if so, whether the receipt by petitioner of amounts attributable to Blue Flame resulted in a taxable dividend. Respondent has treated the purported loan as the prepayment of rentals due under the leases executed by Blue Flame and petitioner contemporaneously with the loan and pursuant to the same agreement. It is too well established to require discussion, and petitioner does not contend otherwise, that the receipt of advance rentals constitutes income to the lessor in the year of receipt regardless of the method of accounting he employs. Sec. 1.61-8 (b), Income Tax Regs.; Roby Realty Co., 19 B.T.A. 696 (1930); A. P. Schiro, Inc., 20 B.T.A. 1026 (1930); Neils Schultz, 44 B.T.A. 146 (1941). Petitioner has taken the position at trial, however, but has failed to file a brief in support thereof, that the advance in question did not constitute an integral part of the lease transaction and therefore was justifiably treated by petitioner as a loan. While petitioner’s premise that a bona fide loan from the lessee to the lessor will not constitute taxable income is fundamentally sound, we have concluded on the baáis of the record before us that the transaction in question more closely resembled payment of advance rentals rather than a loan. The assertion that payment from a lessee constitutes a loan will normally invite the close scrutiny of the Court to determine the true nature of such transaction. The burden of proof in respect of such issue is particularly heavy where the purported loan is received from the lessee under circumstances suggesting the payment is, in effect, of advance rentals. Petitioner must in the very least establish the independence of the loan from the lease transaction. On the state of the record before us, however, not only has petitioner failed to satisfy his burden of proof in this respect, but the evidence plainly points in the opposite direction. We have determined that the cash receipt of $100,000 by petitioner constitutes advance rentals to Blue Flame and to petitioner, to the extent of rental payments due under the respective leases. Thus, the sums of $15,000 due under the Zedrick-Petrolane lease and $85,000 due under the Blue Flame-Petrolane lease constitute taxable income to petitioner and Blue Flame, respectively. We have so concluded, notwithstanding the existence of a promissory note terming the advance a loan. Contemporaneous labels applied by the parties to a transaction, while evidence of their intent, are not conclusive as to the legal effect of the transaction. See, e.g., Oesterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955); and United States v. Williams, 395 F. 2d 508 (C.A. 5, 1968). We note initially the absence of some of the usual attributes of a loan. Despite the substantial period of the purported loan, provision was made neither for the payment of interest nor for security. See Kohler-Campbell Corporation v. United States, 298 F. 2d 911 (C.A. 4, 1962). In this regard, John Wallace, vice president of Petrolane, testified that Petrolane was satisfied that the lease provided adequate security. This attitude is indicative, we think, of prepaid rent rather than a loan. The failure to provide interest and security is to be considered particularly against the background of prior loans in which interest and security were generally provided. More significantly for our determination, however, is the fact that repayment of the advance was neither initially contemplated, nor in fact occurred. Petitioner testified that the respective payments took the form of appropriate bookkeeping entries on the part of Petrolane and Blue Flame. It appears that for this reason the transaction was designed so that payments of like amount would be due from Petro-lane and Zedrick on the same dates. Even accepting the truth of petitioner’s assertions that the parties initially contemplated that checks of like amount would cross in the mail, we could not properly regard such conduct as repayment of the loan without closing our eyes to the realities of the transaction. The fact remains, in either case, that petitioner’s receipt of the purported loan from Petrolane amounted to the receipt of funds for his immediate and unrestricted enjoyment, which by the nature of the transaction, would never have to be repaid. The fact that no repayment would ultimately be necessary, due to the contemporaneous lease obligations incurred by Petrolane, strongly supports characterization of the cash receipt as advance rentals. See United States v. Williams, supra. Moreover, we think the interdependence of the purported loan and lease transactions which is plainly evident from the record marks the receipt of cash from the lessor as “profit arising from the [lease] transaction” rather than a loan and it should therefore be taxable as advance rentals when received. See O'Day Investment Co., 13 B.T.A. 1230 (1928); Roby Realty Co., supra. Petitioner exerted special efforts to realize a substantial amount of cash upon the disposition of Blue Flame’s business assets. Petitioner favored an outright sale of the business to Petrolane for this reason, although he eventually yielded to Petrolane’s desire that the transaction take the form of a lease. The requirement that a loan be extended to petitioner in the sum of $100,000 was incorporated into the agreement respecting the lease at the insistence of the petitioner. The arithmetic of the transaction is particularly damaging to the petitioner’s position since, as indicated earlier, the loan was in the exact amount of the aggregate rent due under the terms of the leases. United States v. Williams, supra. In addition, repayment dates of the loan and the rental payments were intentionally designed to coincide. In this factual setting, the only reasonable inference that can be drawn is that the loan and lease transactions were entirely interdependent. Furthermore, we are convinced from the record before us that the parties themselves did not, in truth, view the transaction in question other than as the prepayment of rent. In United States v. Williams, supra, petitioner leased his property to another for a term of 66 years. The lease agreement provided that the lessee was to pay $19,515 the first year plus $176,175, which was termed a loan from the lessee to the lessor although no promissory note was executed. The loan was to be repaid at 3-percent interest by crediting against it the yearly payments due from the lessee under the lease. The Fifth Circuit, citing the obvious interdependence of the loan and lease transactions, and particularly noting the fact that the loan bore a direct relation to the annual rental payments, held that amounts received constituted advance rentals. The court stated, “The terms of the agreement, its formality and structure, cannot disguise the economic reality of the transaction.” We are thus led to conclude that the receipt of $100,000 constituted rental income to the extent due under the leases. We do not think the fact that petitioner rather than Blue Flame was the recipient of the $85,000 due under the Blue Flame-Petrolane lease in any way precludes the taxability of that amount to Blue Flame in 1963. We think it elementary to tax law that a transaction may be properly broken down to its component steps to reflect the true tax consequences thereof.[1] See George B. Tollefson, 52 T.C. 671, 681 (1969), on appeal (C.A. 2, Oct. 24, 1969). We view in the circumstances of this case, the passage of consideration attributable to the Blue Flame lease to Blue Flame’s sole shareholders, as the receipt of advance rentals by Blue Flame, followed by the payment of a dividend to its shareholders, as the respondent maintains. For reasons articulated in connection with the characterization of the transaction as a loan or prepaid rent, amounts received by petitioner for his unrestricted use and enjoyment must be regarded as a dividend.[2] George B. Tollefsen, supra. The next issue presented is whether petitioner, Blue Flame, is entitled to a bad debt deduction under section 166(g),[3] I.R.C. 1954, for additions of $9,500 to a bad debt reserve upon the sale of its accounts receivable with recourse to Petrolane in 1963. Respondent, on brief, has characterized this issue as a “purely legal one * * * controlled by [section 166 (g) ].” Section 166(g) provides in part: (g) RESEEVE FOE CERTAIN GUARANTEED DEBT OBLIGATIONS.- (1) Allowance of deduction. — -In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction— (A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; and (B) for the amount of any reduction in the suspense account required by paragraph (4) (B) (1). (2) Deduction Disallowed in Other Oases. — Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations. Respondent expresses his position as follows: See. 166(g) (2) specifically disallows deductions by a taxpayer for bad debt reserve additions except as provided by § 166(g) (1). See. 166(g) (1) is limited in its application to a taxpayer who is a “dealer in property.” According to the House Committee Report, the intention of the section is to permit those taxpayers who are dealers in property to obtain a bad debt reserve deduction when they guarantee the factoring of accounts which arise in the ordinary course of their business. H. Rept. 2157 at C.B. 196&-2, 909. Here, where the petitioner sold all of its business, it obviously does not so qualify. We think respondent has misconstrued the statute. Prior to the enactment of section 166(g), the Internal Revenue Service maintained the position that a taxpayer is not entitled to a current deduction for the use of reserve with respect to anticipated losses upon his sale of customer obligations with recourse. Rev. Rui. 62-214, 1962-2 C.B. 72. See generally 5 Mertens, Law of Federal Income Taxation, secs. 30.69 and 30.69(a). Section 166(g) was enacted to settle the controversy which had arisen with regard to deductibility of such bad debt reserves. H. Rept. No. 2157, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 905. There is no suggestion in this provision or in the legislative history thereof, cited above, that factoring of accounts receivable must be made in the ordinary course of business as respondent asserts. Section 166(g) requires only that the debt obligations which are later discounted arise out of the sale of real property or tangible personal property in the ordinary course of business. In the instant case, Blue Flame’s accounts receivable con-cededly arose from the sale of personal tangible property in the ordinary course of business. Blue Flame therefore qualifies for a deduction with respect to the additions to the bad debt reserve occasioned by the sale of such accounts with recourse in 1963. The next issue presented involves the deductibility of losses sustained in the operation of a lumber mill business. Respondent disallowed such deduction on the ground that these business operations were conducted by a corporation. Respondent has also denied a depreciation deduction with respect to assets owned by petitioner individually but used in the conduct of this business for the same reason. Petitioner maintains that the losses in question were sustained by a partnership so that his distributive share of such losses, as well as the depreciation sustained on the assets, is deductible. The issue presented is primarily one of fact upon which petitioner bears the burden of proof. We think petitioner has successfully borne his burden on this issue, notwithstanding the organization of Forest Specialties of Aberdeen, Inc., in 1962. We are satisfied on the basis of the record before us that the business operations which gave rise to the claimed losses were conducted outside the sphere of the existing corporate shell. The losses having been produced by a partnership rather than the corporation, petitioner’s distributive share of such losses is properly deductible.[4] Woods Lumber Co., 44 B.T.A. 88 (1941), acq. 1941-1 O.B. 11; Paymer v. Commissioner, 150 F. 2d 334 (C.A. 2, 1945); John A. Mulligan, 16 T.C. 1489 (1951). Cf. P. O'B. Montgomery, 1 T.C. 1000 (1943), affd. 144 F. 2d 313 (C.A. 5, 1944). Moline Properties v. Commissioner, 319 U.S. 436 (1943), cited by respondent states the basic and well recognized proposition that— The doctrine of corporate entity fills a useful purpose in business life. * * * so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, tbe corporation remains a separate taxable entity. * * * [Emphasis supplied. 819 U.S. at 438, 439.] While we recognize the sanctity of the corporate entity, onr conclusion rests upon the factual determination that the intentions of the organizers of Forest Specialties of Aberdeen, Inc., to activate the corporate shell by transferring their partnership and personal assets to it and conducting a business within the framework of such corporation did not, in fact, materialize. Cases relied upon by respondent, such as Waldron Co., 2 B.T.A. 115 (1925); Hinz & Landt, Inc., of Los Angeles, 8 B.T.A. 375 (1927); Donald M. Perry, 49 T.C. 508 (1968); and Ernest H. Weigman, 47 T.C. 596 (1967), affirmed per curiam 400 F. 2d 584 (C.A. 9, 1968), are plainly distinguishable on their facts since the corporation whose existence the taxpayer sought to disregard, in each case, had at some time owned property and engaged to some degree in business activities. See Paymer v. Commissioner, supra. The facts upon which we have based our conclusion have been set forth in considerable detail in our findings. Petitioner had become interested in the lumber business through his acquaintance with Schumacher and DeBruler. With the prospect of joining these individuals in the operation of a lumber business, a corporation was formed in mid-1962. Articles of incorporation were filed and a State certificate issued. However, due to discord which immediately arose among the parties regarding the value of assets to be contributed, assets owned by Schumacher and DeBruler and operated prior to incorporation by the S & W partnership, and real property owned by petitioner individually, were never transferred to the corporation. Stock authorized in the articles of incorporation, including the qualifying shares subscribed to therein by Schumacher, DeBruler, and petitioner, was never issued or paid for. Following the organizational meeting of the board of directors, no meeting was again held except for the purpose of declaring the corporation inactive. Although filing a copy of the articles of incorporation with the local county clerk’s office was mandatory to limited-liability status, such filing was intentionally omitted. Instead, petitioner and the other individuals commenced operation of the lumber business, utilizing the equipment and machinery owned individually. Manufacturing operations were made possible through the purchase of additional equipment by petitioner individually. The manner in which the business functioned more closely resembled a partnership or joint venture than any other form. Orders were normally directed to petitioner individually rather than to Forest Specialties of Aberdeen, Inc. Letters of collection respecting outstanding debts of the business were directed to petitioner individually and were paid out of his personal funds. The record is clear that petitioner did not seek the protective shield of corporate existence against business creditors, but in fact paid off all debts incurred in the course of the unsuccessful operation of the business following its liquidation in 1963. We are satisfied from the record as a whole, paying close attention to the numerous detailed exhibits entered into evidence, that the business operations in question were sufficiently disjoint from the corporation originally formed, to properly attribute its losses to the partnership or joint venture which, in fact, carried on such business. Petitioner has contested the imposition of additions to tax under sections 6651(a) for late filing and 6653(a) for negligence on the ground that his failure to file was due to reasonable cause. He explains that the late filing was attributable to the chronic alcoholism of his wife, who maintained his financial records. However, petitioner did not file a request for a further extension following the expiration of the prior extension period. In addition, petitioner employed an accountant who could have filed a timely return on the basis of the well kept records of petitioner’s wife. We think petitioner’s explanation falls short of the reasonable cause requirement of the statute and we therefore uphold the determination of respondent in this regard. Decisions will be entered v/nder Bule 50. Our conclusion also finds support in the judicially recognized assignment-of-income doctrine. See Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958). However, we do not think the application of this rule is required under the facts of the instant case. The dividend should be reduced by the portion which Zedrick expended for the benefit of the corporation, but the record furnishes no basis for such determination. Petitioner has not expressed himself on this point and has not filed a brief. Sec. 166(g) was added by sec. [11(a) of Pub. L. S9 — 722, Nov. 2, 1966, several years after the taxable years in question. (Former subsec. (g) was redesignated (h).) However, respondent argues that “it was the intention of Congress to settle all controversies in this area both for prior and future years” citing H. Rept. No. 2157, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 906. The facts of this case are strikingly similar to Bátate of L. B. Barit, T.C. Memo. 1955-268, wherein we reached a similar result, citing and discussing Paymer v. Commissioner, 150 F. 2d 334 (C.A. 2, 1945).