ALAN M. MANTELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ALAN M. MANTELL AND ESTATE OF DIANE G. MANTELL, DECEASED, ALAN M. MANTELL, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mantell v. Commissioner
Docket Nos. 18400-90, 18401-90
United States Tax Court
T.C. Memo 1993-420; 1993 Tax Ct. Memo LEXIS 431; 66 T.C.M. (CCH) 697; September 13, 1993, Filed *431 Decision will be entered under Rule 155. For petitioner: Barbara T. Kaplan. For respondent: Sheila Olaksen. SCOTT SCOTT MEMORANDUM OPINION SCOTT, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1979 and 1980 in the amounts of $ 6,205 and $ 20,576, respectively, and determined that the additional interest provisions of section 6621(c) are applicable to the entire deficiency in each year. After concessions by both parties, the issues for decision are: (1) Whether *432 petitioners must include in income funds received from Cathedral Park Partners during the 1980 tax year and, if so, whether the amount so includable is $ 36,000 or $ 40,000; (2) whether Alan M. Mantell (petitioner) has substantiated and is entitled to deduct accounting and printing expenses paid in 1979 in connection with his promotion of partnership units in Cathedral Park Partners; and (3) whether the increased rate of interest under section 6621(c) is applicable to the deficiency resulting from adjustments to petitioner's distributive share of certain partnership losses with respect to the 1979 tax year. In reaching our decision on the primary issue, we must initially consider whether petitioner assigned contractual rights and obligations to his corporation, A. Mantell, Inc., and, if so, whether this assignment was valid for Federal income tax purposes. Some of the facts have been stipulated and are so found. Petitioner resided in New York, New York, at the time the petitions in these cases were filed. For convenience and clarity, additional findings of fact and the applicable law are discussed together with respect to each issue. 1. Funds Received From Cathedral Park *433 Partners
Petitioner earned a B.A. in economics from the University of Chicago and a J.D. with honors from Columbia Law School. From early 1972 until the end of 1976, petitioner practiced law. In early 1978, petitioner was employed as the head of the development division at Julian J. Studley, Inc., a national real estate brokerage firm. In the middle of 1978, petitioner left this position and assumed the title of director of investment acquisition at a real estate ownership and management firm in New York. At this time, however, petitioner's primary activity became the preparation of the syndication of Cathedral Park Partners (CPP), and he considered that as a practical matter he was self-employed. CPP was a limited partnership formed to develop a nursing home in Buffalo, New York. In December of 1978, petitioner negotiated an arrangement with Larry White (White), the project coordinator for CPP, in which petitioner agreed to conduct an offering to raise the money for the project and to bear the legal, accounting, and other related costs of the offering. This arrangement was set forth in an agreement between petitioner and Red Jacket Development Corporation (Red Jacket), *434 an entity which, through its affiliates, controlled the nursing home development project. Under this agreement, petitioner was to receive a total of $ 200,000 in fees for his involvement with CPP which was to include raising the equity capital of $ 1,500,000. This agreement subsequently was modified to provide that petitioner would receive total fees of $ 160,000 and would not be responsible for the initial $ 40,000 in legal fees. No similar provision was made for any other organizational expenses. In connection with the CPP offering, petitioner was to receive a syndication fee of $ 25,000 and a fee of $ 35,000 for organization expenses. These fees were in consideration for activities performed by petitioner prior to the August 1979 closing date. Of the promised $ 60,000 in fees, at the CPP closing petitioner received $ 52,500 in combined syndication and organization fees. The remaining $ 100,000 fee to be paid to petitioner was in consideration for his undertaking to loan or cause to be loaned to the partnership certain funds which might become necessary to restore any operating deficit (the operating deficit guarantee), for raising the $ 1,500,000 of required equity funding, *435 and for supervising the collection of sums due the partnership from the limited partners. This fee (deficit funding guarantee fee) was to be paid pursuant to a payment schedule set forth in the offering memorandum. The payment schedule provided that petitioner was to receive $ 40,000 on January 1, 1980, $ 30,000 on January 1, 1981, and $ 30,000 on January 1, 1982. An alternate schedule of payments of the $ 100,000 deficit funding guarantee fee was also provided in the event the partnership did not have sufficient funds to make payments of the scheduled amounts. Under the alternate schedule, petitioner was to receive $ 36,000 on January 10, 1980, $ 20,000 on January 10, 1981, $ 15,000 on January 10, 1982, $ 15,000 on January 10, 1983, and $ 14,000 on January 10, 1984. In addition to the operating deficit guarantee, petitioner guaranteed to CPP that the investors that he introduced to CPP would make their payments in a timely way and that petitioner would loan or cause funds to be loaned to CPP in the case of a default by an investor. Petitioner guaranteed investor payments to the extent of $ 100,000. On the closing date of the CPP offering, August 29, 1979, petitioner became *436 a co-general partner of CPP. Pursuant to the partnership agreement, petitioner was to receive a fee of $ 2,000 annually for his general supervisory and administrative services as co-general partner of CPP. Petitioner reported the $ 2,000 annual general partner's supervisory fee received in 1980 on his 1980 Federal individual income tax return. As co-general partner of CPP, petitioner never had access to any of the books and records of CPP. CPP's day-to-day management activities were conducted by White. As a co-general partner of CPP, petitioner was not required to loan or cause to be loaned to the partnership sums in excess of $ 100,000 under the operating deficit guarantee, as determined by the following formula: 1980 - 25% of any cash flow deficit up to $ 18,000; 1981 - 25% of any Operating Deficit up to $ 33,000; 1982 - 25% of any Operating Deficit until all sums loaned or caused to be loaned aggregate $ 80,000 and 20% of any remaining Operating Deficit until all sums loaned or caused to be loaned aggregate $ 84,000; provided, however, that sums loaned or caused to be loaned in 1982 shall not exceed $ 33,000; 1983 - 25% of any Operating Deficit until all sums to be loaned *437 aggregate $ 100,000; provided, however, that sums loaned or caused to be loaned in 1983 shall not exceed $ 16,000.
Pursuant to the CPP Agreement of Limited Partnership (partnership agreement), at any time after January 2, 1980, the managing general partner had the right to remove petitioner as co-general partner with no less than 30 days' notice. This right was exercised in January 1981, and at that time petitioner ceased being a co-general partner of CPP. In the latter part of 1979, petitioner became a principal of Founders Property Corporation (Founders). Founders was in the business of raising capital and developing real estate throughout the United States. In 1979, as requested by Founders, petitioner organized A. Mantell, Inc. (Mantell, Inc.), later called Stuyvesant Securities Corporation, as a broker/dealer registered with the National Association of Securities Dealers (NASD) and the Securities and Exchange Commission (SEC). The function of Mantell, Inc., was to conduct broker/dealer activities in which Founders would be engaged. In the years at issue, petitioner was the sole shareholder and president of Mantell, Inc.Mantell, Inc., elected to be taxed on an accrual *438 basis, and maintained the NASD required minimum capital of $ 7,000. When the corporation was organized, a checking account at Chemical Bank and a money market account with the Daily Income Fund were established in the corporation's name. The bank account records for Mantell, Inc., for its fiscal year ending July 31, 1980, and some investor and due diligence files were destroyed by a fire in the corporation's offices which were located at 477 Madison Avenue, New York, New York, in 1986. For the years in issue, the accounting firm of M.R. Weiser & Co. (Weiser), prepared the tax returns of petitioner and Mantell, Inc. William Hecht (Hecht), a partner in that firm, signed petitioner's returns as preparer. In 1979 Hecht advised petitioner to assign to Mantell, Inc., his CPP agreement, including both the obligations and rights to income. Hecht explained that he was suggesting the concentration of all petitioner's real estate activity in one entity and also the assembling of assets and income to satisfy NASD capital requirements. Weiser maintained a client file for Mantell, Inc., but the file was lost in Weiser's warehouse. By the time Hecht was asked to produce these materials, *439 5 or 6 years after the returns had been filed, they could not be located despite repeated efforts. In the notice of deficiency for petitioner's 1980 tax year, respondent determined that petitioner omitted $ 40,000 from his individual income tax return, which amount represented fees received from CPP on January 10, 1980. Petitioner contends that the contractual obligations of the guarantee of investor payments, the operating deficit guarantee, and the supervision of collection clause were assigned to Mantell, Inc., and that amounts received under the guarantees and for the related services were reported on Mantell, Inc.'s corporate tax return for its fiscal year ended July 31, 1980. Respondent contends that petitioner did not assign his rights and obligations with CPP to Mantell, Inc., and that even if he had made the purported assignment, such assignment was invalid for tax purposes. Petitioner failed to introduce in evidence the written assignment of his CPP agreement to Mantell, Inc., and also failed to introduce documentary evidence that the full amount of the funds received from CPP were deposited into Mantell, Inc.'s accounts. The maintenance of books and records that are *440 sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown on the return is required for every person subject to tax under subtitle A of the Code. Sec. 6001; sec. 1.6001-1, Income Tax Regs. Petitioner and Hecht explained that because of the fire that destroyed some of petitioner's records and the loss of some of Mantell, Inc.'s records that were in the hands of Weiser, some of the records which petitioner and Mantell, Inc., had maintained had been irretrievably lost and simply could not be produced. Nevertheless, because of petitioner's credible, consistent, and uncontradicted testimony, the contemporaneous documents presented in evidence, and the absence of any tax avoidance motives, we have concluded that petitioner's inability to produce the written assignment of his CPP agreement to Mantell, Inc., and the unfortunate loss of records are not fatal to petitioner's case. Petitioner filed with his 1980 individual income tax return a one page statement disclosing that, pursuant to an agreement with Mantell, Inc., $ 40,000 was received by Mantell, Inc., from CPP, and was reported on the corporation's tax return and $ 2,000, representing *441 the annual general partner's management fee, was received by petitioner and reported on his 1980 return. Hecht's workpapers, which were written prior to the preparation of Mantell, Inc.'s returns, indicate that the amount to be received under the operating deficit guarantee was to be included in Mantell, Inc.'s income. In connection with his testimony, Hecht prepared, as a summary, a reconstruction of Mantell, Inc.'s income for 1980 which indicates that the deficit funding guarantee fee was included on Mantell, Inc.'s tax return for the year ending July 31, 1980. In 1979, petitioner informed White orally of the assignment of the obligations. Petitioner never received a release from these obligations, but there was no reason for CPP to release him from his guarantee obligations even though others might also guarantee. Petitioner did not assign any of his other obligations to CPP or rights to income from CPP to Mantell, Inc. To perform its obligation under the assumption agreement, Mantell, Inc., on its own letterhead, wrote letters to the investors who were in default to obtain collection of the funds, monitored the collection process in general, and regularly corresponded with *442 the investors on every payment date. Petitioner testified about his reason for the assignment, the drafting technique and terminology, and his actions consistent with the assignment. His testimony was clear, detailed, and credible. Hecht testified as to his recommending the assignment and his action in preparing tax returns consistent with the assignment. Despite the loss of records, he was able to prepare a summary of such records based on available materials. He explained the loss of records with appropriate regrets. We have no reason to disbelieve Hecht's testimony about the assignment and the income trail. The assumption and assignment agreement between Mantell, Inc., and petitioner was written by petitioner in 1979 and stated that Mantell, Inc., would assume petitioner's responsibilities to guarantee payment of a portion of any operating deficit and to supervise and guarantee investor payments, and that Mantell, Inc., would receive all fees that petitioner would have received from the partnership for giving those guarantees. [2]
*443 By check dated January 25, 1980, CPP remitted payment to petitioner under the guarantees in the amount of $ 36,000. This check was endorsed by petitioner and deposited into his personal account on February 3, 1980. Based on petitioner's credible and consistent testimony, and Mantell, Inc.'s Daily Income Fund Statement, it is clear that at least $ 28,000 of this amount was transferred into Mantell, Inc.'s accounts during its fiscal year ended July 31, 1980. There is no documentary evidence conclusively showing that the remainder of the CPP payment was deposited into Mantell, Inc.'s accounts in the fiscal year ending July 31, 1980. However, closely held corporations are not held to the same standard of corporate formalities as publicly held corporations, John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469 (1965), and transactions between shareholders and their closely held corporations are often carried on in an informal manner. Furthermore, Mantell, Inc., was an accrual basis taxpayer, and therefore, the actual receipt of cash in the year ended July 31, 1980, is not dispositive of the issue in this case. What is significant is that the *444 CPP payment was accrued by Mantell, Inc., for the fiscal year ending July 31, 1980, and was included in the gross receipts of Mantell, Inc., for the fiscal year ending July 31, 1980. In its tax return for the fiscal year ended July 31, 1980, Mantell, Inc. reported $ 73,526 of gross receipts consisting of $ 36,000 from CPP and $ 37,526 from Founders. Mantell, Inc., accrued compensation to petitioner in the amount of $ 40,961 for the fiscal year ending July 31, 1980. The $ 40,961 accrued by Mantell, Inc., consisted of three items: $ 10,500 of salary that the corporation paid to petitioner in December 1979, a $ 22,000 accrued bonus and 2 months' salary at the rate of $ 50,000 per year that petitioner began to draw starting in June of 1980. Although petitioner stated in his disclosure statement that he received $ 42,000 from CPP in 1980 and that he assigned $ 40,000 of this amount to Mantell, Inc., it is clear from the evidence presented in this case that CPP only transferred to petitioner $ 38,000 in 1980. This amount consisted of the $ 2,000 general partner's salary which was reported on petitioner's 1980 individual income tax return, and a $ 36,000 payment in satisfaction of the *445 amount due pursuant to the operating deficit guarantee and other items, which was paid according to the deferred payment schedule. Petitioner's contention, that the CPP K-1 indicating a payment in 1980 in the amount of $ 42,000 was incorrect, is supported by the check entered into evidence in the amount of $ 36,000 and CPP's audited financial statement for 1980 which shows the accrual of the full $ 40,000 deficit funding guarantee fee by CPP and the payment to petitioner of only $ 36,000 of that fee in 1980. Accordingly, we find that petitioner assigned all obligations and rights under the operating deficit guarantee, the supervision of collection clause, and the guarantee of investor payments to Mantell, Inc., that in January 1980, CPP paid a deficit funding guarantee fee in the amount of $ 36,000 pursuant to the deferred payment schedule, and that this amount was included in the corporate tax return of Mantell, Inc., for the year ending July 31, 1980. Respondent next argues that we should sustain the determination that the deficit funding guarantee fee is includable in petitioner's income for 1980 under the assignment of income doctrine on the ground that the contract was for *446 personal services and is therefore unassignable under the principles enunciated in Lucas v. Earl, 281 U.S. 111 (1930), and its progeny. Petitioner contends that the contract rights and obligations assigned in this case did not entail personal services and therefore the assignment does not come within the ambit of Lucas v. Earl, supra. We agree with petitioner that the contract was not for the personal services of petitioner and was assignable, and that the fees received under the deficit funding guarantee obligations are taxable to Mantell, Inc.
It is a well-settled principle of Federal tax law that income will be taxed to the one who earns it or otherwise creates the right to receive it and enjoy the benefit of it when paid. Commissioner v. Culbertson, 337 U.S. 733 (1949); Helvering v. Horst, 311 U.S. 112 (1940); Lucas v. Earl, supra.A taxpayer may not avoid his tax liability by the simple expedient of drawing up legal papers assigning income which he has earned to another. Trousdale v. Commissioner, 16 T.C. 1056, 1065 (1951), *447 affd. 219 F.2d 563 (9th Cir. 1955). However, the principles of Lucas v. Earl, supra, are not applicable where the income is derived from the assumption of a fully assignable bilateral contract obligation to be performed by the assignee, is not for personal services, did not represent fees for income earned prior to assignment, and was accrued by a corporation that served a legitimate business purpose. Commissioner v. Montgomery, 144 F.2d 313 (5th Cir. 1944), affg. 1 T.C. 1000 (1943); see Iowa Bridge Co. v. Commissioner, 39 F.2d 777, (8th Cir. 1930), revg. 14 B.T.A. 1048 (1929). The contract provisions assigned in this case did not require any personal services of petitioner. The operating deficit guarantee, supervision of collection clause, and the guarantee of investor payments were business agreements between petitioner and CPP, in which petitioner guaranteed the payment of moneys from investors, supervised the collection of such sums, and guaranteed loans to CPP in the case of an operating deficit, *448 for consideration of $ 100,000. Duties and obligations under the operating deficit guarantee, the supervision of collection clause, and the guarantee of investor payments were required to be, and were performed by Mantell, Inc., subsequent to the assignment. Moreover, the operating deficit guarantee was enforceable against petitioner, his successors, heirs, and personal representatives. This provision further supports our conclusion that neither party to the contract understood that this guarantee required the personal services of petitioner. The operating deficit guarantee was a guarantee to lend funds to CPP in the case of an operating deficit and did not require personal services. The income earned by Mantell, Inc., was not earned by petitioner and assigned without consideration, as in Lucas v. Earl, supra, nor did it represent only a right, vested in petitioner to receive income from property, prior to assignment, as in Helvering v. Horst, supra, nor was the income earned and assigned solely to be collected as in Helvering v. Eubank, 311 U.S. 122 (1940). Here, by an assumption *449 and assignment agreement, petitioner assigned all rights and obligations, the tree and its fruits, of the guarantees to Mantell, Inc. See Lucas v. EArl, supra at 115. The income at issue here arose from the performance of the contract by Mantell, Inc., subsequent to assignment for the valuable consideration of assuming the obligation under the deficit funding agreement. Such income is taxable to the assignee, Mantell, Inc. See Montgomery v. Commissioner, supra at 1004. Respondent further contends that the guarantees entailed no risk or obligation and that all work was performed prior to assignment. Respondent contends that all that remained for petitioner to do was to receive the deferred payments which were simply subject to being partially offset if the limited partners did not adhere to their payment contracts. We do not agree. The operating deficit and investor payment guarantees put petitioner at risk for substantial sums and were undertakings to guarantee any CPP operating deficit, to supervise the collection of sums due from the limited partners, and to guarantee investor payments in the case of defaults. These obligations *450 existed for approximately 4 1/2 years after the date of closing. Respondent relies upon Johnson v. Commissioner, 78 T.C. 882, (1982), affd. without opinion 734 F.2d 20 (9th Cir. 1984), and contends that we should apply the test set forth in that case in determining whether a valid assignment was made here. The Johnson case involved a basketball player who assigned his contract with the team that employed him to his personal service corporation. However, Mantell, Inc., unlike the corporation in the Johnson case, was not a personal service corporation. Mantell, Inc., was a broker-dealer of securities established by petitioner at the request of Founders and in furtherance of a valid business reason. Furthermore, unlike the income at issue in the Johnson case, the fee for undertaking the guarantees is not personal service income. The guarantees are collateral agreements for performance of another's undertaking, or "promises to answer for payment of debt or performance of obligation if person liable in first instance fails to make payment or perform obligation." Black's Law Dictionary 705 (6th ed. 1990). Respondent *451 also cites Helvering v. Eubank, supra, but that case is inapplicable here. In contrast to the Eubank case, here duties and obligations were required to be performed by the assignee, Mantell, Inc. At the time of the assignment, petitioner did not yet have any right to receive payment of the deficit funding guarantee fee. See Morgan Guaranty Trust Company of New York v. United States, 218 Ct. Cl. 57, 585 F.2d 988 (1978). Furthermore, the Eubank case involved payment for personal services previously rendered. In the present case, the contract was not for personal services, and no amounts received by Mantell, Inc., were attributable to personal services of petitioner performed either prior to or subsequent to the assignment. The organization of Mantell, Inc., and the assignment of the guarantees were accomplished for valid business reasons. Petitioner organized Mantell, Inc., in order to satisfy Founders' need to have a registered broker-dealer for purposes of raising partnership equity capital. Under the agreement with Founders, all income paid to petitioner for broker-dealer type services *452 was to be paid to Mantell, Inc. As a result of this business structure it was reasonable for Hecht to advise petitioner to assign the CPP contract to Mantell, Inc. First, the assignment of the CPP income to Mantell, Inc., would assist in building up additional equity in the corporation for purposes of satisfying NASD capital requirements. Secondly, it would place all of petitioner's real estate development activities under one operating entity. Furthermore, since funds would also be going into Mantell, Inc. from Founders, Mantell, Inc. would have necessary funds in the event that either of the guarantees were called. Generally, a corporate entity which has been used to serve a business purpose may not be disregarded and recharacterized as a shareholder's alter ego unless the corporation is a sham or unreal. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439 (1943). Mantell, Inc., was organized by petitioner for legitimate business purposes, and the assignment between petitioner and Mantell, Inc., was accomplished for valid business reasons. Accordingly, the assignment of the contract rights and obligations by petitioner to Mantell, Inc., *453 was a valid assignment, and the income attributable to that assignment is taxable to the earner, Mantell, Inc.
2. Accounting and Printing Expenses
In the notice of deficiency for 1979, respondent disallowed the deduction of accounting fees in the amount of $ 3,000 and printing fees in the amount of $ 2,020. These expenses were incurred in connection with the preparation of the offering memorandum for CPP. The accounting work for the CPP offering memorandum, including the projections incorporated therein, was done by the accounting firm of Weiser & Co. for a fee of $ 3,000. In addition, as part of the expenses of the preparation of the offering memorandum, petitioner paid fees for the printing of 75 copies of the CPP offering memorandum and 4 hard-bound copies of the CPP memorandum, and for the printing and binding of 75 separate subscription documents. When petitioner incurred the accounting and printing fees in issue, he was not a partner in CPP. Neither the CPP offering memorandum nor the CPP partnership agreement provided for the payment of the accounting or printing costs associated with the offering. Respondent has stipulated that petitioner paid accounting fees *454 in the amount of $ 3,000 during the 1979 tax year. Respondent disallowed the accounting expense on the grounds that petitioner was reimbursed for the expense, that the partnership agreement did not provide for the payment of such expense, and that the expense was a capital expenditure and therefore is not currently deductible. Respondent disallowed the printing fee due to lack of substantiation. Respondent also contends that the printing fee was an organizational cost and must be capitalized. Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Petitioner has the burden of proving that respondent's determinations are in error and that he is entitled to the claimed deductions. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). There is no support in the record for respondent's contention that petitioner was reimbursed for the accounting expenses. Petitioner was a credible witness and his testimony that he was not reimbursed for the accounting expenses is consistent with the record. Pursuant to the agreement between petitioner and Red Jacket, petitioner was "to *455 bear the legal and accounting fees he may incur by retaining professionals to prepare the necessary offering materials under applicable securities laws." The accounting fees were attributable to projections incorporated in the offering memorandum and therefore were expenses petitioner was to bear under his agreement with Red Jacket. Respondent contends that, as a partner in CPP, petitioner cannot claim partnership expenses he has paid with his own funds as deductions against his individual gross income unless the partnership agreement requires the partner to pay such expenses. However, petitioner was not a partner when the accounting fees were incurred, nor did he incur the fees as an investor in CPP. The accounting fees were incurred prior to the time petitioner became a partner in CPP and were incurred in his capacity as promoter. Respondent next contends that the accounting fees are not deductible because they are start-up expenses, and, pursuant to section 709(a), generally no deduction shall be allowed to the partnership or to a partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. However, *456 the expenses at issue were not incurred by CPP, but by petitioner in furtherance of his trade or business of promoting and not in his capacity as a partner of CPP. The type of fees that are subject to section 709(a) and the amortization provisions of section 709(b) are fees such as the syndication and organization fees that CPP paid to petitioner. Petitioner incurred and paid the accounting expense at issue in the ordinary course of his trade or business of promoting. Pursuant to his agreement with Red Jacket, petitioner was to bear this type of expense. This agreement was not supplanted as to the payment of this expense, and, accordingly, we find that petitioner is entitled to a deduction for accounting fees in the amount of $ 3,000 in the 1979 tax year. Respondent contends that petitioner has not provided any documentary evidence to prove that the printing fees were paid in 1979. Section 6001 and the regulations promulgated thereunder require the taxpayer to maintain adequate records in substantiation of claimed deductions. However, even in the absence of adequate substantiation, we generally may, if convinced by the evidence, estimate the amount of deductible expenses incurred. *457 Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Such an estimate must, however, have some reasonable evidentiary basis. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). The payment in 1979 of the printing expense in the amount of $ 2,020 for the printing of the CPP offering memorandum is established by petitioner's credible oral testimony, and the presentation of the offering memorandum in evidence. Pursuant to the agreement with Red Jacket, petitioner was liable for the expenses of preparing the necessary offering materials. There is no evidence in the record that this agreement was supplanted as to this expense. Accordingly, we find that petitioner paid a printing expense of $ 2,020 in 1979. Respondent also contends that the printing expense is not deductible under section 709 and must be capitalized. For the reasons stated above, section 709 is not applicable to the expenses incurred in this case. Accordingly, petitioner is entitled to deduct printing fees in the amount of $ 2,020. 3. Increased Interest
In the notice of deficiency, respondent determined that petitioner was liable for the increased *458 interest as provided under section 6621(c) on that portion of the underpayment that is attributable to tax-motivated transactions. After concessions by both parties, the issue is limited to the increased interest with respect to the deficiency attributable to a reduction in petitioner's distributive share of the losses from CPP and Trails of Marymount, Ltd. (Marymount) for 1979. Respondent contends that the adjustments made at the partnership level were made because the accounting methods used by each partnership caused a substantial distortion of income. Petitioner bears the burden of proof on the applicability of section 6621(c). Rule 142(a). Section 6621(c) provides for an increased interest rate where a "substantial underpayment" (an underpayment of taxes in excess of $ 1,000) in any taxable year is attributable to one or more tax-motivated transactions. Section 6621(c) applies with respect to interest accruing after December 31, 1984, even though the transactions were entered into prior to the date of enactment. Cherin v. Commissioner, 89 T.C. 986, 1000 (1987) (citing Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), *459 affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986)). Among the "tax-motivated transactions" enumerated in section 6621(c)(3)(A) is: (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, * * *
Temporary regulations under section 6621(c)(3)(A)(iv) prescribe accounting methods that may "result in a substantial distortion of income." Sec. 301.6621-2T, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984).[3] Respondent argues that petitioner's claimed losses in 1979 from CPP and Marymount were excessive because of deductions disallowed under section 709 with respect to organization or syndication expenses of the partnerships. We conclude that petitioner has not met his burden of proving that the disallowed deductions on the partnership returns and the subsequent reduction in petitioner's flow-through losses were not attributable to circumstances listed in the applicable temporary regulations. *460 Accordingly, respondent's determination is sustained on the applicability of section 6621(c) to the deficiency attributable to the conceded adjustments in the 1979 tax year, provided the underpayment in the 1979 tax year attributable to the conceded adjustments exceeds $ 1,000. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although we find that the assignment here was set forth in a written document, an oral assignment is not fatal if the parties indicate their intention and act on it. See Iowa Bridge Co. v. Commissioner, 39 F.2d 777 (8th Cir. 1930), revg. 14 B.T.A. 1048↩ (1929).
3. The above-cited regulations state: A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: (1) Any deduction disallowed for any period by reason of section 464 or section 278(b), relating to certain expenses of farming syndicates; (2) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any interest deduction disallowed for any period by reason of section 461(g), relating to prepaid interest, provided the interest is not paid with respect to indebtedness incurred in connection with (i) the purchase, refinancing, or improvement of the principal residence of the taxpayer, or (ii) the purchase of consumer goods by the taxpayer; (3) Any interest deduction disallowed for any period because the amount of the claimed deduction was computed using a method resulting in an amount of interest for a period that exceeds the true cost of the indebtedness for the period computed by applying the effective rate of interest on the loan to the unpaid balance of the loan for that period (i.e., the economic accrual of interest for the period), provided the interest is not accrued with respect to indebtedness incurred in connection with (i) the purchase, refinancing, or improvement of the principal residence of the taxpayer, or (ii) the purchase of consumer goods by the taxpayer (see Rev. Rul. 83-84, 1983-1 C.B. 97, and sections 163(e) [now sec. 163(a)], 446(b), and 483); (4) Any deduction disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership; (5) In the case of any expenditure described in section 248(b) that was incurred by an S corporation, any deduction disallowed because it exceeds the amount allowable under section 248, relating to organizational expenditures; (6) Any deduction disallowed for any period under section 267(a), relating to transactions between related taxpayers; (7) Any deduction disallowed for any period, or any income required to be included for any period, under section 467, relating to certain payments for the use of property or services; (8) Any deduction disallowed for any period under section 461(i), relating to certain deductions of tax shelters; and (9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income (see, e.g., Rev. Rul 79-229, 1979-2 C.B. 210↩).